UNITED STATES of America, Plaintiff–Appellee,

v.

Robert Mason GRAY, Defendant–Appellant. (Two Cases)

Nos. 94–5076, 94–6459.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 29, 1994.

Decided Feb. 28, 1995.

1360

**ARGUED:** Joseph John McCarthy, Dawkins, Delaney, McCarthy, Powell & Colton, P.C., Alexandria, VA, for appellant. Gordon Dean Kromberg, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty., W. Neil Hammerstrom, Jr., Vince Gambale, Asst. U.S. Attys., Alexandria, VA, for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Reversed and remanded in part and affirmed in part by published opinion. Judge RUSSELL wrote the opinion, in which Judge WIDENER and Senior Judge PHILLIPS joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

On June 30, 1993, a grand jury in the Eastern District of Virginia returned a seventeen-count indictment against Defendant–Appellant Robert Mason Gray and eight others. Gray was charged with conspiracy to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 846 (Count One), money laundering in violation of 18 U.S.C. §§ 1956 and 2 (Counts Two, Five, Six, Ten, Twelve, and Fifteen), money laundering in violation of 18 U.S.C. §§ 1957 and 2 (Counts Three, Four, and Seven), money structuring in violation of 31 U.S.C. § 5324 (Counts Eight and Nine), and a forfeiture count (Count Seventeen). After a trial from October 4 to October 7, 1993, a jury convicted Gray on all counts. On appeal, we reverse and remand his convictions on Counts Eight and Nine for money structuring and affirm his convictions on all other counts.

### I.

For several years until his arrest in 1991 at age 26, Wesley Snyder headed a marijuana trafficking conspiracy based in Prince William County, Virginia. Through visits to marijuana dealers in Texas approximately every three weeks, Wesley obtained and transported thousands of pounds of marijuana to Virginia for redistribution. From this drug trafficking, Wesley earned and spent large sums of money. The government argued at trial that Gray assisted Wesley's conspiracy by laundering the cash Wesley collected from the sale of marijuana. The government never contended that Gray handled or sold any marijuana. The primary factual issue at trial was whether Gray knew that Wesley was a drug dealer and that the money Gray invested on behalf of Wesley was obtained illegally through drug trafficking.

On December 11, 1991, investigators searched Gray's home pursuant to a search warrant issued earlier that day. Officer Gregory Kroes submitted the affidavit in support of this warrant. Among other things, Kroes' affidavit declared that a confidential informant stated that Gray laundered over $1 million in drug money for Wesley Snyder through the purchase of stocks and bonds. To support the reliability of the informant, Kroes' affidavit further asserted that the informant's statements had been verified and proven reliable through independent investigation and that the informant had provided the information freely, having no criminal charges pending against him at the time Kroes prepared the affidavit.

All documentary evidence produced by the government and received in evidence at trial was seized during this search of Gray's residence. Prior to trial, Gray moved the district court to compel the government to disclose the identity of the confidential informant. He advised the court of the possibility that the magistrate who issued the search warrant had been misled by the affidavit's assertions that the informant acted freely and had no pending charges. The district court denied this motion.

At trial, Gray admitted that he had conducted numerous financial transactions on Wesley Snyder's behalf and that, between 1986 and 1991, he had received more than $114,000 in cash from Wesley and had purchased more than $121,000 worth of assets for Wesley. Gray also admitted that he had provided a credit card on his account number to Wesley for Wesley's personal use and that he had traveled to Texas with Wesley on at least five occasions between August 1989 and December 1990. Gray maintained, however, that he had no actual knowledge of the true nature of Wesley's marijuana trafficking activity. Gray testified that he believed that Wesley was in the construction business and had a "sugar daddy." Joint Appendix (JA) at 862. Gray's belief as to Wesley's source of income was important because the parties agreed that Wesley exhibited lavish wealth for a man in his early twenties. This extravagance was also noteworthy because Gray knew that Wesley had declared bankruptcy

and lacked a business office, credit card, or bank account in his own name.

The government's case rested primarily on documentary exhibits, entered by stipulation, demonstrating Gray's financial transactions for Wesley and on two key witnesses who testified that Gray knew that Wesley was a drug dealer. Gray denied the allegations of these witnesses. The government's first key witness was Gary Doane, Wesley's cousin, who had been raised as a foster child in the Snyder home. Sometime around 1985 or 1986, Doane began buying marijuana from Wesley for resale to others. By the summer of 1991, Doane was buying up to three pounds of marijuana per week from Wesley at $1,600 per pound.

Doane testified that he had actual knowledge of Gray's overt participation in Wesley Snyder's marijuana business. Doane rented a 22–acre parcel of land in Virginia from Gray and kept marijuana in a shed adjacent to the house he rented on Gray's property. Doane testified that he and Gray openly discussed the fact the Doane and Wesley were conducting drug deals from Doane's home owned by Gray. Doane added that Gray expressed concern that Wesley and Doane would draw attention to themselves because they conducted their drug operations out of Doane's home. Doane stated that Gray also posted the $5,000 bail for Doane when Doane was arrested for marijuana possession in October 1991.

On cross-examination, Doane acknowledged that he had little or no knowledge about several of the co-defendants. Doane also intimated that Gray might have harmed or killed him if he had revealed to Gray's first lawyer that Gray was aware of Wesley's marijuana trafficking.[1] On redirect, Doane clarified his earlier contention by stating that his life had been threatened on three occasions but that he was unsure whether Gray had been the person threatening him.

The government's second key witness was Olen Snyder, Jr., Wesley's brother. Al-

though Olen did not sell or distribute any marijuana for Wesley, Olen stated at trial that he was involved in the conspiracy by storing marijuana at his home and by helping his brother bag the drugs. Olen testified that he introduced his brother to Gray after Gray repeatedly told Olen that he could launder Wesley's drug money and invest the money so that both Gray and Wesley could profit. Olen added that Gray traveled to Texas with Wesley approximately 20 times and that Gray admitted to Olen that he and Wesley were traveling to Texas to pick up marijuana.

On cross-examination, Olen admitted, in pertinent part, that he was a coconspirator, that he was given immunity in exchange for his testimony, and that he was testifying to protect his immediate family. After Olen, Officer Kroes testified and affirmed Olen's statements that, pursuant to an agreement with the police, Olen would not be charged if he cooperated and testified against his brother and others.

In addition to these key witnesses, the government called other witnesses who offered damaging testimony against Gray. Margaret Mendez, one of the indicted coconspirators, was a resident of San Antonio, Texas. She testified that between 1988 and 1991, Wesley traveled to Texas numerous times to purchase drugs from her husband and another coconspirator. On one occasion, she saw Wesley arrive at her home to pick up marijuana and noticed that Wesley was accompanied by another man driving a Mercedes with Virginia license plates. According to Mendez, in plain view of the man in the Mercedes, Wesley loaded duffel bags of marijuana into the back of the pickup truck Wesley was driving. Although the man never got out of the Mercedes and she never got a look at his face, Mendez stated at trial that the Mercedes she saw in front of her house looked similar to the Mercedes that Gray later purchased from Wesley after the trip to Texas.[2]

---

1. The district court denied Gray's request for a curing instruction based on this statement.

2. Mendez testified that the Mercedes she saw in front of her home was "like a blue green, dark

color," JA at 446–47, while Gray's Mercedes was black. Doane testified at trial, however, that Gray purchased the Mercedes from Wesley and repainted the car from dark green to black.

Gray's contact with Wesley in Texas was supported by Jennifer Dalton, an employee of Western Union, who testified that Gray attempted to wire money to Wesley in Texas. The government also called Frances M. Kane, who was employed at a branch of Signet Bank located across the street from Gray's home. Kane testified that on three occasions Gray came to the branch to deposit $9,000, $9,000, and $1,500 in cash.[3]

At the close of all the evidence, Gray moved the district court to include in its charge to the jury an instruction on multiple conspiracies, referring the court to the fact the several witnesses at trial were unfamiliar with Gray and the other alleged coconspirators. The court refused this instruction and instead gave instructions that did not distinguish between multiple and single conspiracies. On October 7, 1993, the jury convicted Gray on all counts.

On April 5, 1994, Gray moved the district court for leave to contact jurors to enable him to investigate a claim that some of the jurors did not understand English well enough to comprehend the proceedings. The claim was based on the affidavit of William E. Nowers, who had sent a letter dated March 20, 1994, to the district court, informing the court that he had spoken with several jurors and had gathered evidence that at least one juror, and possibly two, may not have been linguistically qualified to serve. One juror specifically told Nowers that she followed "eighty percent" of the proceedings and that she didn't follow "the big words." Another juror stated that she "wished none of the jurors had English as a second language." Supp. JA at 1101–02. On April 15, 1994, the district court denied Gray's motion; and this Court directed that the appeal for the denial of Gray's motion be consolidated with his appeal of his conviction.

## II.

■ Gray and the government agree that the Supreme Court's recent decision in Ratzlaf v. United States, — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), requires reversal of Gray's convictions on the money structuring counts under 31 U.S.C. § 5324. Under 31 U.S.C. § 5322, a person who "willfully" violates § 5324 is subject to criminal penalties. Although the district court's instructions at the time were consistent with the law in this Circuit, see United States v. Rogers, 962 F.2d 342, 344 (4th Cir.1992), the Supreme Court in Ratzlaf added an additional element the government must now show in order to prove that a defendant willfully violated § 5324. Specifically, the Supreme Court held that the government must show that a defendant acted with the knowledge that his conduct was unlawful under the statute. Ratzlaf, — U.S. at —, 114 S.Ct. at 657. The district court did not provide this additional element in its jury instruction in this case. Thus, because the new ruling in Ratzlaf applies to this case, see Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (holding that new rules for criminal prosecutions apply retroactively to all cases not yet final), we reverse Gray's convictions on Counts Eight and Nine and remand the case to the district court.

## III.

Although we find that Ratzlaf requires reversal of Gray's money structuring convictions, we hold that Gray's numerous challenges to his convictions on the other counts lack merit. Two of Gray's challenges, however, warrant some discussion.

## A.

■ Gray contends that the district court erroneously denied his pre-trial and post-trial motions to disclose the identity of the confidential informant mentioned in Kroes' affidavit, which supported the search warrant for Gray's home. Because Gray speculates that the confidential informant was Olen Snyder, Gray argues that allegedly incriminating impeachment evidence should have served as a basis for pre-trial disclosure, warranting a hearing under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A decision not to require disclosure of a confidential informant is within the discretion of the district court. United States v. Blevins,

---

**3.** Both parties acknowledged that the third deposit was actually $9,000.

960 F.2d 1252, 1260 (4th Cir.1992); *United States v. Mabry,* 953 F.2d 127, 132 (4th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992).

Under *Franks,* the Supreme Court held that the Fourth Amendment entitles a defendant to a pre-trial hearing to challenge the validity of a search warrant affidavit if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676. The Court added that "[t]he deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." *Id.* at 171, 98 S.Ct. at 2684.

■ As the government recognizes, Gray has never established that the affidavit in support of the search warrant contained "allegations of falsehood" on the part of the affiant, Officer Kroes. Instead, Gray relies on evidence implying that the confidential informant was Olen Snyder and argues that Kroes' affidavit was misleading because it stated that the informant had no pending charges and disclosed the information "freely and voluntary" even though Olen himself was involved in the drug distribution offenses committed by his brother Wesley. Gray contends that the magistrate who issued the warrant would have undoubtedly considered the information on Olen's involvement and background to be material in adjudging Olen's credibility.

Assuming Olen Snyder was the informant, Kroes' statement in his affidavit was correct when he made it on December 11, 1991. When Olen began cooperating with Prince William County police narcotics investigators, Olen had no charges pending against him and he cooperated voluntarily without promises of immunity. Olen did not receive immunity from the prosecution until September 30, 1993, four days prior to Gray's trial. Moreover, although information regarding Olen's involvement may have affected the magistrate's consideration of the affidavit,

Gray's evidence does not satisfy the standard in *Franks* that the affiant himself made a knowing and intentional false statement. *See id.* at 155–56, 98 S.Ct. at 2676–77. We thus hold that Gray did not establish the requisite showing on the part of the affiant to warrant a *Franks* hearing.

Importantly, we acknowledge that Gray's motions did not specifically request a *Franks* hearing but rather asked for the disclosure of the informant's identity in order to determine whether, at that point, a *Franks* hearing was warranted. Considering our conclusion that Gray currently has insufficient evidence to satisfy the standard for a *Franks* hearing, we must determine whether requiring the government to disclose the name of the informant would lead Gray to uncover new evidence strong enough ultimately to satisfy the *Franks* standard. Gray presumes that Olen Snyder was the confidential informant and bases his arguments on this assumption. Compelling the government simply to disclose the informant's name if it is Olen, however, would not give Gray any more material evidence to satisfy the *Franks* standard than he already has had the opportunity to obtain.

We nevertheless recognize that this Court has consistently held that the government is not privileged to withhold the name of a confidential informant when the informant's identity is relevant and helpful to the defense or is essential to fundamental requirements of fairness. *E.g., United States v. Price,* 783 F.2d 1132, 1137 (4th Cir.1986) (quoting *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957)). This benefit to the defendant of knowing the informant's identity is one factor a court must consider in deciding whether to order disclosure under the balancing test established by the Supreme Court in *Roviaro v. United States,* 353 U.S. 53, 60–62, 77 S.Ct. 623, 627–29, 1 L.Ed.2d 639 (1957). In *Roviaro,* the Court rejected a per se approach to the disclosure of an informant's identity and instead adopted a test that balances "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62, 77 S.Ct. at 629.

In conducting this *Roviaro* balancing, this Court has emphasized that the key to reviewing a district court's failure to compel disclosure is a balancing of the competing interests "in light of the particular circumstances of the case." *Mabry*, 953 F.2d at 131 (quoting *United States v. Brinkman*, 739 F.2d 977, 981 (4th Cir.1984)). We have also determined that an important factor affecting disclosure is the informant's involvement in the criminal acts of the accused. In delineating the significance of this involvement, we have held that the government is privileged to withhold the identity of the informant when the informant was a "mere tipster," *e.g.*, *McLawhorn v. North Carolina*, 484 F.2d 1, 5 (4th Cir.1973), or was used only for obtaining a search warrant, *e.g.*, *United States v. Poms*, 484 F.2d 919, 922 (4th Cir.1973), but that failing to disclose the informant's identity more likely amounts to error when the informant was an active participant in the events leading to the arrest of the accused, *e.g.*, *Blevins*, 960 F.2d at 1258.

Applying the above principles to this case and assuming Olen Snyder was the informant, we conclude that Gray's request for disclosure is controlled by the well settled principle that the government is permitted to withhold the identity of a confidential informant when "the informant was used only for the limited purpose of obtaining a search warrant." *Poms*, 484 F.2d at 922 (quoting *United States v. Fisher*, 440 F.2d 654, 656 (4th Cir.1971)); *see also Rugendorf v. United States*, 376 U.S. 528, 534–35, 84 S.Ct. 825, 829, 11 L.Ed.2d 887 (1964) (holding that defendant was not entitled to disclosure of informant when defendant had requested disclosure at trial only in his attack on the affidavit supporting the search warrant).

In so reasoning, we recognize that Olen actively participated in the Wesley Snyder marijuana trafficking conspiracy, in addition to providing important information establishing probable cause for the search of Gray's residence. Gray's arguments before this Court and in his post-trial motion before the district court, however, specifically request disclosure solely so that he may challenge the validity of the search warrant.[4] He argues that by disclosing the informant's identity, he may be able to garner evidence entitling him to a *Franks* hearing to invalidate the search. In effect, Gray's request thus parallels the request denied in *United States v. Whiting*, 311 F.2d 191, 196 (4th Cir.1962), *cert. denied*, 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766 (1963), in which this Court declined to order disclosure when "the names of the informers were wanted in support of the effort to invalidate the search warrant and not to help the defendants in the presentation of their case."[5] Furthermore, as noted above, disclosing the name of the informant, if it is Olen Snyder, would not invalidate the warrant under *Franks* because evidence demonstrates that Kroes was truthful when he stated that Olen voluntarily provided the information and that Olen had no charges pending against him. Thus, given the particular circumstances of this case, we hold that the district court did not abuse its discretion in denying Gray's motion to disclose the identity of the confidential informant.

### B.

Gray also contends that the district court denied Gray his Sixth Amendment right to an impartial jury by denying his motion for leave to contact jurors under Rule 20 of the Local Rules of the Eastern District of Virginia. Rule 20 forbids counsel to approach

---

4. Gray's pre-trial motion requested that the district court compel the government to disclose "any confidential informant(s)" because the disclosure of such informants "is both necessary and useful in the defendant's preparation for trial." JA at 56–57. These general assertions, however, are limited by Gray's post-trial arguments and arguments before this Court, which make it clear that Gray seeks disclosure solely to challenge the validity of the search warrant.

5. Furthermore, we note that Olen's involvement as an informant was significantly different from the involvement of the informants in *Roviaro*, *Price*, and *McLawhorn*, cases in which the Supreme Court and this Court found that the district court committed reversible error by declining to order the disclosure of the informant. In those cases, the informants actively participated in arranging the specific criminal transactions that led to the defendants' arrests. *See Roviaro*, 353 U.S. at 57, 77 S.Ct. at 626; *Price*, 783 F.2d at 1139; *McLawhorn*, 484 F.2d at 6.

jurors "except on leave of court granted upon good cause shown and upon such conditions as the court shall fix." Fed. Local Ct. Rules, ED Va Rule 20. After Gray filed this appeal, William Nowers contacted him regarding the English language proficiency of some of the jurors in Gray's case. Gray then moved for leave of court to contact the jurors in anticipation of filing a motion for a new trial in the event his investigation confirmed Nowers' findings. The district court held a hearing to consider the matter and then denied Gray's motion on April 15, 1994.

■ In analyzing the different legal theories the parties present in their briefs on this question, we note that Gray concedes he has waived his claim under the Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq.,* because he failed timely to challenge the language proficiency of the jurors.[6] Furthermore, we are of the opinion that the allegations in Nowers' letter and affidavit do not present sufficient evidence that Gray was denied his Sixth Amendment right to an impartial jury, and we note that it is premature for this Court to speculate concerning other evidence Gray may find upon investigation unless he first has presented good cause to obtain leave of court to investigate the language proficiency of the jurors. Therefore, the isolated issue for this Court to address at this stage is whether the district court properly determined that Gray did not demonstrate good cause to warrant a leave of court to contact the jurors. In reviewing the

district court's decision, we recognize that, although the district court did not explicitly rule on the jurors' competency, this Court considers a district court's determination of juror competency to be a finding of fact, which will not be overturned absent clear error. *United States v. Hall,* 989 F.2d 711, 714 (4th Cir.1993).

As sole grounds for his motion, Gray presents the letter and affidavit from disinterested third party Nowers in which Nowers indicates that he spoke with some of the jurors and that the interviews revealed that one or more of the jurors did not speak English as a first language and failed to comprehend portions of the trial proceedings.[7] In addressing these grounds, the parties discuss several cases that have analyzed post-trial relief based on various forms of juror incompetency, and the cases demonstrate that the resulting circumstances warranting relief are extremely limited. For example, in *Hall* this Court applied a strict standard to motions for post-trial relief based on juror mental incompetency. After recognizing a defendant's constitutional right to mentally competent jurors, this Court reasoned that a defendant must produce "clear evidence of a juror's incompetence" in order to set aside a jury verdict. *Id.* at 714 (quoting *United States v. Dioguardi,* 492 F.2d 70, 78 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974)). Based on this standard, this Court refused to overturn the district

---

6. Gray did not raise his claims about the jurors' English language proficiency until after his conviction and after he took his appeal, well outside the time limit prescribed in § 1867(a). *See, e.g., United States v. Webster,* 639 F.2d 174, 180 (4th Cir.) (holding that defendant waived claim that Black citizens were underrepresented in the jury pool because defendant failed to raise claim within the statutory time limits), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

7. Nowers, a retired Navy fighter pilot, became involved with this case while visiting his attorney about an unrelated matter. Knowing that Nowers had an interest in the criminal justice system, his attorney's secretary mentioned this case to Nowers. Nowers subsequently called the jurors in the case, and from these interviews, obtained the information at issue regarding the jurors' English proficiency. *See* JA at 1103; Oral Argument in *United States v. Gray,* No. 94–5076, Sept. 29, 1994.

In pertinent part, Nowers' letter reads:

Specifically, I obtained comments from one juror that she wished, "none of the jurors had English as a second language". Another stated that they had no problem but did have to help one or two of the jurors understand. Another stated that even an American without too much education would have had trouble. But the most damaging was the comments from [name redacted], a Vietnamese (juror no.1 I believe). When asked if she were the jury foreman she didn't understand the question even when it was repeated. When asked if she could follow the trial in English, she said, "... not two percent I follow eighty percent. I don't follow the big words." And also "they use big words I don't understand." She also later repeated that, "eighty percent I know, just two percent confuse me."

Supp. JA at 1101.

court's conclusion that a juror was not mentally incompetent at trial even though the defendant produced evidence that the juror "had been voluntarily committed nine times, had been diagnosed as schizophrenic by thirteen different psychiatrists and by the Virginia Department of Mental Health and Retardation, [and] had experienced episodes of extremely violent behavior including attempts to kill his family members . . . ." *Id.*

■ Although this Court has not addressed the specific issue of post-trial relief based on juror English language proficiency, we believe a strict standard similar to that in *Hall* should apply to the issue of language proficiency. We therefore follow other circuits and hold that, where timely objections are not filed, as in this case, subsequent doubts about a juror's linguistic competence will not constitute grounds for relief absent a showing of either " 'manifest' or 'clear' injustice," or "manifest prejudice." *United States v. Nickens,* 955 F.2d 112, 117 (1st Cir.) (manifest or clear injustice), *cert. denied,* —— U.S. ——, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); *United States v. Silverman,* 449 F.2d 1341, 1344 (2d Cir.1971) (manifest prejudice), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *cf. United States v. Currie,* 609 F.2d 1193, 1194 (6th Cir.1979) (applying abuse of discretion review to post-trial claim that district judge had improperly qualified certain jurors), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). For instance, the First Circuit in *Nickens* held that the district court did not abuse its discretion in denying the defendant's motion for a new trial even though two

jurors who had served on his jury were later stricken for cause during jury selection in an unrelated case because of their lack of proficiency in English. *Nickens,* 955 F.2d at 116–18; *see also United States v. Cepeda Penes,* 577 F.2d 754, 759 (1st Cir.1978) (declining to grant new trial where defendant claimed that one juror could not sufficiently understand English); *Thornburg v. United States,* 574 F.2d 33, 34–37 (1st Cir.1978) (denying motion to vacate sentence where defendant claimed that possibly four jurors could not sufficiently understand English); *Guam v. Palomo,* 511 F.2d 255, 258–59 (9th Cir.1975) (rejecting contention that juror was linguistically unqualified to serve).[8]

■ Given the existing allegations in Nowers' letter, we conclude that the district court did not err in refusing to grant Gray's motion for leave of court. All the jurors in Gray's case had passed the statutory linguistic competency standard under the Jury Selection and Service Act, 28 U.S.C. § 1865, well before the voir dire stage. Pursuant to § 1864(a), each juror had completed a juror qualification form prior to being summoned, and § 1865(b)(2) provides that jurors are proficient in English if they are able to complete the form satisfactorily.[9] Each juror in Gray's case had also completed a jury qualification card, which inquires about place of birth and place of employment.[10] Importantly, this information was available to Gray and his counsel prior to voir dire. *See* 28 U.S.C. § 1867(f); Fed. Local Ct. Rules, ED Va Rule 9(A). During voir dire, Gray's counsel requested that the district court ask the jurors certain questions that were of special interest

---

**8.** Gray correctly argues that, at this stage, he need only produce good cause in order for the district court to grant leave to allow him to contact the jurors. Thus, he need not satisfy the stringent standards applied in *Nickens, Silverman,* and *Hall* until he contacts the jurors and chooses to seek to vacate his sentence or obtain a new trial. The district court, however, could properly consider these standards in determining whether Gray produced good cause and whether he could, even after investigation, produce a legitimate constitutional challenge to the competency of his jurors.

**9.** The juror qualification form used in this case specifically asked the potential jurors whether they can "read, write, speak and understand the

English language," and whether another person completed the form on their behalf. Interestingly, the juror who told Nowers "eighty percent I know, just two percent confuse me," had someone complete the form on her behalf. After considering the other evidence on the juror's form, however, the Jury Section in the Clerk's Office of the Alexandria Division of the Eastern District of Virginia considered her qualified, as signified by the notation on her qualification form.

**10.** The jury qualification card for the juror who told Nowers "eighty percent I know, just two percent confuse me," stated that she was born in Saigon and had lived in Virginia for 17 years.

to Gray's case, and the court made such inquiries. Although the English proficiency question was not at issue at that stage in the case, Gray's counsel similarly could have protected Gray's rights by requesting that the district court ask each juror whether he or she could read, write, and understand English.[11] Gray's counsel did not make such a request, and during voir dire, no juror responded negatively to the court's general question as to whether any of them would be unable to render a fair and impartial verdict.

Moreover, Nowers' allegations are not extraordinary and do not constitute a threshold showing of incompetence necessary to demonstrate good cause. At most, his claims only show that certain jurors spoke English as a second language and that two jurors had difficulty understanding all the proceedings and needed the assistance of other jurors to comprehend certain issues at trial. Gray's concerns would be significant, for instance, if they demonstrated that the assistance needed by the jurors fundamentally affected the jurors' impartiality. Accordingly, given the fact that information regarding juror qualifications was available to Gray and his counsel prior to voir dire, and the insufficient nature of Nowers' allegations, we hold that the district court did not err in refusing to grant Gray's motion for leave of court to contact the jurors.

## IV.

Gray also presents several other challenges to his convictions. We can dismiss these claims more perfunctorily than his two challenges above.

First, Gray seeks reversal of his conviction on Count One by arguing that the district court erred in declining to instruct the jury regarding multiple conspiracies. To support his theory that multiple conspiracies existed in this case, Gray emphasizes that: (1) the

government only called two of the nine indicted coconspirators to the stand, Doane and Mendez; (2) only Doane was familiar with Gray; and (3) both were unfamiliar with many of the other coconspirators.[12] Because we recognize the superior position of the district court to evaluate evidence and formulate the jury instruction, we normally defer to a district court's decision to withhold a defense or theory in a proposed jury instruction. *See United States v. Horton*, 921 F.2d 540, 545 (4th Cir.1990), *cert. denied*, 501 U.S. 1234, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *see also United States v. Williams*, 604 F.2d 277, 281 (4th Cir.) (applying plain error review to district court's decision to withhold proposed instruction), *cert. denied*, 444 U.S. 967, 100 S.Ct. 457, 62 L.Ed.2d 381 (1979).

In order to hold a conspirator criminally liable for the acts of other members of the conspiracy, the Supreme Court has held that the acts must be "reasonably foreseen as a necessary or natural consequence" of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), *quoted in United States v. Irvin*, 2 F.3d 72, 75 (4th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994). It is well established that each conspirator need not know the other conspirators in order for all of them to be engaged in a single conspiracy. *See Blumenthal v. United States*, 332 U.S. 539, 557–59, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). This Court has further held that "[a] court need only instruct on multiple conspiracies if such an instruction is supported by the facts." *United States v. Mills*, 995 F.2d 480, 485 (4th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 283, 126 L.Ed.2d 233 (1993).

At trial, Gray's defense was that he was not part of any conspiracy, and he produced no evidence that multiple conspiracies

---

11. In the Eastern District of Virginia, only the district judge asks the potential jurors questions at voir dire. The parties' attorneys do not ask questions, but they can submit requests that the judge ask specific questions. The judge is not obligated to make the requested inquiries, but such a refusal can constitute reversible error in certain contexts. *See United States v. Rucker*, 557 F.2d 1046, 1047–49 (4th Cir.1977) (reversing

conviction where district court did not grant the defendant's request for a specific inquiry on voir dire into the physical and mental competence of the potential jurors).

12. The government also called Woodrow Knight, an unindicted coconspirator, who testified that he did not know Gray.

existed. Gray contends that obligating a defendant to offer evidence of multiple conspiracies would require a defendant to concede the existence of some conspiracy before that defendant could obtain a jury instruction on multiple conspiracies. This assertion misstates the law because, in actuality, Gray need not have conceded the existence of a conspiracy in order for the district court to have instructed the jury on multiple conspiracies in this case. Rather, this Court has held that a district court may provide a particular instruction as long as evidence presented by any party at trial supports the theory or defense in the instruction.[13] *Horton,* 921 F.2d at 544; *see Williams,* 604 F.2d at 281. In this case, the evidence developed at trial does not provide a foundation upon which a jury could find that multiple conspiracies existed. We therefore find that the district court did not err in refusing Gray's request for a multiple conspiracy instruction.

Second, Gray complains that the district court erred in refusing to caution the jury that it should not draw any inferences from Doane's testimony in which Doane suggested that Gray had threatened his life. Doane made the statement at issue during Gray's attempt on cross-examination to establish that Doane had no incentive to lie to Gray's previous attorney when Doane claimed that Gray knew nothing of Wesley Snyder's drug trafficking:

Q: Now, when you told Mr. Cummings [Gray's previous attorney] [that Gray knew nothing of Snyder's drug trafficking], he had nothing to offer you in terms of reduction of your sentence, did he?

A: No, he did not.

Q: He had no plea bargain he could give you to get you out of this jam, did he?

A: No, but he could allow people to know that I was going to testify against Mr. Gray, and my life could be threatened again. So, that was my reason.

JA at 417–18.

We review for abuse of discretion the district court's refusal to caution the jury regarding inferences to be drawn from admitted evidence. *See United States v. Vogt,* 910 F.2d 1184, 1192 (4th Cir.1990) (reasoning that assessments of relevance and prejudice of evidence are committed to broad discretion of district judge), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). Although Gray's questioning on cross-examination did not explicitly invite Doane's implication that Gray had threatened his life, we conclude that the district court did not abuse its discretion in allowing Doane's explanation based on its reasoning that his answer was pertinent to Gray's general inquiry into why Doane made the contradictory statement.

Moreover, any prejudice Gray may have suffered from Doane's comment was essentially remedied when Doane clarified his statement on redirect and stated that he did not know whether Gray had ever threatened his life:

A: Well, at that time in my life I had been threatened with my personal well-being three occasions. Actually, my life had been threatened on three occasions.

Q: You didn't know that it was Bobby Gray, did you?

A: No, sir, I did not. *I didn't know specifically who it was.*

JA at 434 (emphasis added). Thus, regardless of whether the district court should have offered a clarifying instruction when Doane made his first statement, any harm done was corrected by the redirect of Doane.[14]

---

**13.** Although the district court may provide an instruction if the evidence supports it, a defendant is not *entitled* to a particular instruction unless he or she advances the relevant theory at trial. *Horton,* 921 F.2d at 544. Thus, Gray is not entitled to the multiple conspiracy instruction because he did not advance the multiple conspiracy theory at trial.

**14.** In effect, the district court provided on "recross" the cautioning instruction Gray desired.

After an objection by the government to Gray's questioning, this colloquy followed:

MR. McCARTHY [Gray's attorney]: If they are trying to draw an inference that Bob Gray is trying to assassinate somebody—

\* \* \* \* \* \*

THE COURT: [The government attorney] said specifically that wasn't the case. Objection sustained.

JA at 436.

Gray also raises other assignments of error involving the consideration of marijuana to be a dangerous drug for purposes of his money laundering convictions, the district court's limitation of his cross examination of Olen Snyder, the establishment of venue in the case, the qualification and testimony of expert witness William Rhode, and the timeliness of the evidence supporting the search warrant of his residence. We find that each of these arguments lacks merit.

## V.

For the foregoing reasons, we reverse Gray's convictions for money structuring under Counts Eight and Nine and remand to the district court. We affirm Gray's convictions on all other counts.

*REVERSED AND REMANDED IN PART; AFFIRMED IN PART.*