# UNITED STATES of America, Plaintiff,

v.

# Danny R. WESTMORELAND, Defendant.

## No. CRIM.A. 3:97–00034.

United States District Court,
S.D. West Virginia,
Huntington Division.

Oct. 9, 1997.

---

Hunter P. Smith, Charleston, WV, John Frail, Charleston, WV, for Plaintiff.

Benjamin L. Bailey, Charleston, WV, Thomas W. Smith, Charleston, WV, Brian A. Glasser, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the Court is defendant Dr. Danny Westmoreland's motion to suppress evidence seized by federal and state law enforcement agents during a June 23, 1995 raid on Westmoreland's home and medical office. Although law enforcement agents conducted the raid pursuant to a valid search warrant, the defendant argues that the manner in which the agents executed the raid violated his Fourth Amendment right to be free from "unreasonable searches and seizures." The agents' conduct during the June 23, 1995 raid was outrageous and unreasonable. However, Westmoreland's motion to suppress fails as a

matter of substantive Fourth Amendment law because the agents did not direct their unreasonable conduct at the defendant, but rather at patients in the defendant's waiting room. Abuses suffered by the doctor's patients do not implicate Westmoreland's personal Fourth Amendment rights. Accordingly, the Court must **DENY** the defendant's motion to suppress evidence seized during the June 23, 1995 raid.

For the last eighty years, the federal judiciary has resorted to the exclusionary rule to discourage unreasonable police conduct. *See Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (providing U.S. Supreme Court's initial articulation of exclusionary remedy). However, the exclusionary rule is not the only method by which unlawful police conduct may be discouraged. Civil remedies may be available to redress the wrongs suffered by the patients. Furthermore, given the inexplicable and egregious conduct of agents in this case, the Court has every reason to expect that the executive branch, which oversees and leads federal law enforcement agencies, will address this situation. The United States Attorney General, who is the chief federal law enforcement official, and her agent, the United States Attorney, are executive branch officials and officers of the court. As such, they have both the power and the duty to ensure that law enforcement agents observe constitutional requirements during searches and seizures. Further, they have the ability to ensure that unreasonable police conduct does not go unremediated.

Also pending before the Court is the defendant's motion to dismiss counts twenty-five through thirty-five of the indictment. For reasons stated herein, the defendant's motion is **GRANTED** in part and **DENIED** in part. The Court **ORDERS** that all references to "distribution" and 21 U.S.C. § 860, and the language, "within one thousand (1,000) feet of the real property comprising a public secondary school, namely, Wahama High School," be stricken from the indictment.

### Factual Summary

In a thirty-seven count indictment, the United States charged defendant Dr. Danny Westmoreland with Medicaid fraud in violation of 18 U.S.C. §§ 1341 and 2, unlawful distribution by prescribing, dispensing, and administering controlled substances to patients in violation of 21 U.S.C. §§ 841(a)(1) and 860, and failure to keep accurate records of Schedule II drugs administered to patients in violation of 21 U.S.C. § 842(a)(5). These charges resulted from a lengthy investigation conducted by federal agents working in conjunction with West Virginia law enforcement. During the course of the investigation, several of Westmoreland's employees provided information to the agents. In particular, Sheila Russell Murphy, a billing clerk, provided names of patients suspected of drug abuse and explained Westmoreland's billing code system. The agents also conducted undercover surveillance of Westmoreland at the Westmoreland Family Care Center, a building that housed both Westmoreland's medical office and his family home. The Westmoreland Family Care Center is located in Mason County, West Virginia.

The investigation culminated in a highly orchestrated raid of the Westmoreland Family Care Center on June 23, 1995. Law enforcement agents conducted this raid as a full-scale assault. After obtaining a search warrant authorizing the seizure of medical records and patient files, the investigating agents assembled a team of officers from the Drug Enforcement Agency (DEA), the Internal Revenue Service, the United States Postal Inspector's Office, the West Virginia Medicaid Fraud Control Unit, the Kanawha County Sheriff's Department, and the West Virginia State Police. In total, seventeen officers were organized to execute the search warrant.

At 8:00 A.M. on June 23, 1995, members of the team met at the Charleston, West Virginia, DEA office to review the operational plan. There was only one sentence in the operational plan that mentioned a potential threat to law enforcement: "Son may have access to rifle in residence." (Suppression Hr'g Tr. at 169.) There was no evidence that agents attempted to confirm that Westmoreland's son had access to a rifle or that he would be present during the search. Furthermore, although Agent Sherri Lanham

testified that there was some discussion of "alleged controlled substance abuse," (Suppression Hr'g Tr. at 212), it is clear that the agents knew the search warrant for documents and files would be executed during business hours in a small-town doctor's home and office, with patients and staff present.

Despite the improbability of violent resistance, the agents prepared as if they would confront heavily armed and dangerous criminals during the raid. With few exceptions, members of the team carried guns and wore bulletproof vests. The DEA agents wore civilian clothing and flak jackets with a DEA insignia on the back. The team even found it necessary to obtain a battering ram.

The team of agents then traveled to a Mason County location near the Westmoreland Family Care Center. There, the team met the West Virginia state officers. West Virginia State Police Sergeant Dale Humphreys expressed concern about the amount of force the team planned to use: "[S]omething to the fact that I didn't think we needed a battering ram." (Suppression Hr'g Tr. at 26.) Humphreys also noted to the agents that their plan for executing the search warrant might be inappropriate, given the circumstances:

> I explained to them that this was a doctor's office and I most likely would know the people inside. I felt that there would be some people in there, a lot of people that wasn't expecting this. So, I suggested that we, that I would go in. . . .

(Suppression Hr'g Tr. at 26.)

Despite Sergeant Humphreys's sensible objections, the team proceeded as planned and blocked off streets near the Westmoreland Family Care Center. Agents moved in for the raid.

What happened next was vividly recounted at the suppression hearing by patients who had the misfortune of scheduling appointments with Westmoreland that morning. Joyce Day, a patient seated in the waiting room, described the scene:

> I was sitting there. I had a book on my lap and the TV was just above me. I could hear the TV. I was glancing through the book and all of a sudden, I heard some-

body holler, "Up against the wall." And I glanced up and they said, "Up against the wall now." And everybody started getting up. And they said, "Up against the wall now, DEA, federal agents." And everybody turned around and I dropped my book to the floor and just stood up, put my hands against the wall.

(Suppression Hr'g Tr. at 33–34.)

At 10:40 A.M., when agents stormed Westmoreland's office and home, there were between fifteen and twenty patients in the waiting room, as well as patients in examining rooms. Some of Westmoreland's patients were elderly. The doctor's staff was also present. Without any notice, five to seven agents stormed into the waiting room and pointed guns at patients waiting to see the doctor. The agents loudly ordered the patients to stand and to place their hands against the wall. (Suppression Hr'g Tr. at 34.) The agents then commanded the patients not to move and forced them to remain standing still with their hands over their heads and placed against the wall for as long as eight minutes. When the agents finally allowed the patients to sit down, they confiscated driver's licenses and identification cards. They questioned everyone in the room. The patients still were not allowed to move.

Because the agents wore civilian clothing and did not immediately identify themselves, some patients did not realize that the armed persons who stormed the waiting room were law enforcement agents. Joyce Day testified that, "It was just startling to see somebody come in waving a gun at you and telling you, 'Up against the wall.'" (Suppression Hr'g Tr. at 39.) According to Ms. Day, agents shouted, "Up against the wall," three times before identifying themselves as law enforcement officers. Ms. Day further testified that the events so startled "a lady sitting across from me [that she] grabbed her chest and started breathing real hard like she was having a hard time breathing." (Suppression Hr'g Tr. at 36.) Jerry Allen Walker, another patient, also testified about the morning's events. It is telling that Mr. Walker, a fellow law enforcement officer with the West Virginia Public Service Commission, was "to-

tally shocked" by the manner in which agents conducted the raid. (Suppression Hr'g Tr. at 55.) Agents also held Westmoreland's sixteen-year-old daughter in the waiting room, as she cried, "My brother's in the house. My brother's in the house. Somebody help me get my brother." (Suppression Hr'g Tr. at 37.)

As several agents "secured" the waiting room, other agents rushed through a second door to an area in which files and examining rooms were located. Charles Kearns, a retired coal miner, was waiting for the doctor on an examination table when agents burst into his examination room. As with the patients in the waiting room, agents forced Mr. Kearns to put his hands up while an agent frisked him for weapons. Prior to the frisk, Mr. Kearns informed the agents that, "All I've got is my truck keys in my left pocket." (Suppression Hr'g Tr. at 47.) Nevertheless, the agent checked Mr. Kearns's left pocket to confirm that he did not have "any guns or knives." (Suppression Hr'g Tr. at 47.) Thereafter, agents held Mr. Kearns with the other patients in the waiting room, and he too was forced to stand with his hands above his head and against the wall. Over thirty minutes passed before the agents allowed any patients to leave. During the suppression hearing, Ms. Day recalled the morning's events:

> I was scared to death. When I left, I went home and it just hit me like a ton of bricks, you know. I thought, you know, this was just something out of a movie, but it wasn't. It was real. And it scared me and I couldn't sleep and I still have flashbacks of it. . . . To think that somebody could come into an office and start waving guns around with people that are there to see the doctor for health purposes is really scary.

(Suppression Hr'g Tr. at 38.)

The Government stipulated and agreed that, if called, all fifteen to twenty patients in Westmoreland's waiting room that morning would testify in a manner consistent with the testimony of Joyce Day, Jerry Allen Walker, and Charles Kearns.

The agents' outrageous conduct did not end in Westmoreland's medical office, but continued into the portion of the building comprising the Westmoreland family home. Although there is some dispute as to what agents knew when entering the building's residential section, Agent Sherri Lanham testified that Westmoreland's daughter told agents that no one was in the residence. (Suppression Hr'g Tr. at 218.) Thus, when agents heard noises coming from the upstairs bedrooms, they drew their weapons to prepare for a threat. That "threat" turned out to be no more than Gloria Griffin, Westmoreland's sixty-one-year-old housekeeper, and Patrick Westmoreland, Westmoreland's nine-year-old son. When Ms. Griffin appeared at the top of the stairway, two agents pointed their guns at her and ordered her to descend the stairs with her hands held up. She refused, explaining that a nine-year-old child was upstairs. Agents then demanded that Ms. Griffin show them the child. When Ms. Griffin returned with Patrick, agents ordered them to come downstairs, never taking their guns off Ms. Griffin and the child. Agent Lanham admitted pointing the gun in their direction, but claimed that it was merely in a "ready position." (Suppression Hr'g Tr. at 220.) Although agents recovered a loaded gun from the dining room table, there was no justifiable reason to continue holding the housekeeper and the nine-year-old child at gunpoint. Westmoreland and his wife were immediately outside the front door to the residence when this incident occurred, and although Patrick attempted to run to his parents, agents escorted both Ms. Griffin and the child off the premises.

By the end of the day, agents seized virtually all of the items listed in the warrant. The defendant's counsel provided authorities with the remaining items within a few days. Westmoreland also provided authorities with additional items listed in an administrative subpoena, which was served on Westmoreland's counsel during the course of the raid. Although agents seized items throughout the building, at trial the Government plans only to present evidence seized from the office portion of the Westmoreland Family Care Center.

## Analysis

### I. The Motion to Suppress

The defendant advances four arguments to support his motion to suppress. First, and most significantly, Westmoreland argues that agents violated the Fourth Amendment and the "knock and announce" rule embodied in 18 U.S.C. § 3109 by executing the search warrant in an unreasonable manner. Second, the defendant argues that evidence seized by his employee, Sheila Russell Murphy, amounted to a warrantless search. Third, he argues that the affidavit supporting the search warrant lacked reliability and failed to demonstrate any basis for presuming its reliability. Finally, Westmoreland argues that the number of objects and documents seized exceeded the scope of the warrant. The Court will address each of these arguments in turn.

#### A. Unreasonable Execution of the Warrant

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

 Although the Warrant Clause offers a guarantee of reasonableness, "possession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy." *Hummel–Jones v. Strope*, 25 F.3d 647, 650 (8th Cir.1994). Rather, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979). Courts determine reasonableness by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct.

1694, 1699, 85 L.Ed.2d 1 (1985) (citation and internal quotations omitted).

In this case, it is patently clear that agents executed the search warrant in an unreasonable manner. The Government has "accept[ed] the finding that these actions amounted to a constitutionally unreasonable seizure of the patients." (Gov't Opp'n Mot. Suppress at 10.) The facts in this case compel the Government's acceptance. It is inexplicable why agents thought it necessary to hold between fifteen and twenty innocent citizens at gunpoint, to order them to turn and place their hands against the wall, and to demand that they remain motionless in that position for eight minutes. The agents had no reason to suspect that any patient was armed and dangerous or that a patient would interfere in the execution of the warrant.

It is just as clear that agents were unreasonable in holding Ms. Griffin and the defendant's nine-year-old son at gunpoint. Given the loaded gun found on the dining room table and the unexpected noises from upstairs, agents may have been justified in drawing their weapons. However, the agents' safety concerns subsided once Ms. Griffin and the child showed themselves: At that point, it became unnecessary to terrify the child and the housekeeper by pointing a gun at them.

 Nevertheless, the Court's findings do not entitle the defendant to suppression of the evidence. This is not to say that Westmoreland lacks standing to challenge the search and seizure; Westmoreland clearly had a reasonable expectation of privacy in both the office and the residential portions of the building, as well as in the items seized by agents. Rather, the defendant's motion to suppress fails as a matter of substantive Fourth Amendment law. Because the agents conducted the search pursuant to a warrant, the illegality cannot arise from the fact that a search occurred. Instead, it was the manner in which agents executed the search that violated the Fourth Amendment. Yet the agents did not inflict their outrageous conduct on the defendant, but on his patients, housekeeper, and child. Westmoreland was neither present nor personally ag-

grieved by the unreasonable execution of the search warrant in the waiting room or in the residence. Like most constitutional rights, "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). Thus, "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights." *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). Although this Court finds the agents' conduct egregious, "[The Supreme Court's] Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices." *Id.* at 735, 100 S.Ct. at 2446. Therefore, although agents executed the warrant on the defendant's property, the abuses suffered by the patients, housekeeper, and child do not implicate Westmoreland's personal Fourth Amendment rights. Accordingly, the Court may not suppress the evidence seized during the raid on these grounds.

■ Nor is the evidence seized subject to suppression under 18 U.S.C. § 3109, the "knock and announce" statute. The requirement that officers knock and announce their presence before forcibly entering a home is not only a statutory requirement, but also part of the general Fourth Amendment reasonableness inquiry. *Richards v. Wisconsin,* —— U.S. ——, ——, 117 S.Ct. 1416, 1418, 137 L.Ed.2d 615 (1997). In this case, agents conducted themselves in such an outrageous manner that failure to knock and announce seems the least of the harms done. However, as previously discussed, the agents' unreasonable conduct did not infringe on Westmoreland's personal Fourth Amendment rights. Agents entered the building through Westmoreland's waiting room. Because the waiting room was open to the public, there was no need to knock and announce. Once agents were lawfully inside the structure, there is no further statutory requirement to knock and announce at the door leading to

the inner office. *See, e.g., United States v. Crawford,* 657 F.2d 1041, 1045 (9th Cir.1981).

## B. Warrantless Search

■ The defendant further argues that the Court should suppress evidence because his employee, Sheila Russell Murphy, provided information to investigating agents as part of a warrantless search. Westmoreland has failed to meet his burden of proof on this issue. To invoke Fourth Amendment protections, a defendant must show state action. *See Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980). Wrongful search or seizure by a private party is not enough; rather, the defendant must show that the private party "acted as an instrument or agent of the state." *United States v. Kinney,* 953 F.2d 863, 865 (4th Cir.), *cert. denied,* 504 U.S. 989, 112 S.Ct. 2976, 119 L.Ed.2d 595 (1992) (citation and internal quotations omitted). In order for a private party to be considered an instrument of the state, "[t]he government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions." *United States v. Walther,* 652 F.2d 788, 791 (9th Cir.1981).

■ Westmoreland has offered insufficient evidence to prove that Sheila Russell Murphy acted as an instrument of the state in conducting a warrantless search. The defendant largely relies on Ms. Murphy's neighbor, Jennifer Carson, who testified that she often saw Ms. Murphy with patient files in her home. Yet Ms. Murphy and two investigating agents testified that Ms. Murphy did not conduct a search of patient files at the request of law enforcement. Ms. Murphy also offered an alternative explanation of why she worked with patient files in her home. The Court cannot conclude from this scant and conflicting evidence that Ms. Murphy acted as a government agent when conducting a warrantless search of Westmoreland's files. Accordingly, the Court may not suppress the evidence on these grounds.

## C. Lack of Reliable Information to Support Affidavit

■ The defendant also argues that the Court should suppress the evidence because

the affidavit used to obtain the search warrant contained unreliable statements from informants, without supplying any basis to presume the informants' reliability. The defendant's argument misses the mark. Probable cause to issue a search warrant is determined by examining the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Even if the affidavit did not specifically assert that the informants were reliable, the magistrate could still have found probable cause to issue a search warrant based on the totality of the circumstances. *See United States v. Miller,* 925 F.2d 695, 698 (4th Cir.), *cert. denied,* 502 U.S. 833, 112 S.Ct. 111, 116 L.Ed.2d 80 (1991). In this case, the Court is satisfied that the affidavit contained more than enough information for the magistrate to ascertain the existence of probable cause. Although the defendant also alleges that agents intentionally misled the magistrate in several portions of the warrant affidavit, the defendant has not substantiated this claim, much less made the "substantial preliminary showing" necessary to call for a hearing. *See Franks v. Delaware,* 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *United States v. Gray,* 47 F.3d 1359, 1364 (4th Cir.1995).

### D. Seizures Exceeded Scope of Warrant

Finally, the defendant alleges that the evidence should be suppressed because the number of items seized by agents exceeded the scope of the warrant. Again, the defendant has offered very little to substantiate this claim, and the Court can find no basis to suppress evidence on these grounds.

After reviewing each of the grounds supporting the defendant's motion to suppress, the Court **FINDS** that the defendant failed to establish a Fourth Amendment violation warranting application of the exclusionary rule. Accordingly, the defendant's motion to suppress evidence is **DENIED.**

### II. Motion to Dismiss Counts Twenty-five Through Thirty-five of the Indictment

Also pending before the Court is the defendant's motion to dismiss counts twenty-five through thirty-five of the indictment. These counts charge Westmoreland with "distribut[ion] [of certain drugs] ... by prescribing, dispensing, and administering [the drugs] ... neither for legitimate medical purposes in the usual course of his professional medical practice nor within the bounds of professional medical practice" within 1000 feet of a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860. Because the Court **FINDS** that the double penalty provision embodied in 21 U.S.C. § 860 does not apply to *dispensing* controlled substances, the Court **ORDERS** all references to § 860 and the language, "within one thousand (1,000) feet of the real property comprising a public secondary school, namely, Wahama High School," stricken from the indictment. However, the Court **ORDERS** that counts twenty-five through thirty-five of the indictment remain in force, insofar as they charge the defendant with violations of 21 U.S.C. § 841(a)(1).

Section 841(a)(1) of Title 21 provides in pertinent part:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense, a controlled substance.

21 U.S.C. § 841(a)(1).

Section 841(a)(1) thus criminalizes four distinct types of conduct when accompanied by the requisite mental state: (1) unauthorized manufacture of controlled substances; (2) unauthorized distribution of controlled substances; (3) unauthorized dispensing of controlled substances; and (4) unauthorized possession of controlled substances. In this case, the indictment technically charged Westmoreland with the distribution of controlled substances by administering or dispensing the drugs to patients. Section 802(11) defines "distribute" for purposes of § 841(a)(1) and states that, "the term 'distribute' means to deliver (*other than* by administering or dispensing) a controlled substance." 21 U.S.C. § 802(11) (emphasis added). Although the Fourth Circuit has not addressed whether a physician who delivers drugs outside of his or her normal

practice and for no legitimate medical purpose is guilty of unlawful "dispensing" or unlawful "distributing," according to § 802(11), it is impossible to distribute controlled substances by administering or dispensing them. Therefore, the Government cannot charge Westmoreland with distribution under § 841(a)(1).

 However, § 841(a)(1) also criminalizes unlawful "dispensing" of controlled substances. According to § 802(10), "the term 'dispense' means to deliver a controlled substance to an ultimate user ... by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10). A physician who may otherwise be authorized to dispense controlled substances violates § 841(a)(1) when he or she dispenses controlled substances "outside the bounds of professional medical practice ... for other than a legitimate medical purpose." *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir.1994). In this case, the indictment includes the appropriate charge that Westmoreland unlawfully dispensed controlled substances. Although inartfully stated, the language of counts twenty-five through thirty-five of the indictment was sufficient to put the defendant on notice that the indictment charged him with violations of § 841(a)(1).

 Although the Court **FINDS** that the misapplication of "distributing" and "dispensing" does not affect the validity of the § 841(a)(1) charges in the indictment, the misapplication has a vital impact on the validity of the § 860 charges. Section 860 of Title 21 provides in pertinent part:

Any person who violates section 841(a)(1) ... by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of a ... school ... is ... subject to twice the maximum punishment authorized by section 841(b) ... and at least twice any term of supervised release authorized by section 841(b) ... for a first offense.

21 U.S.C. § 860.

Section 860 does not have the same scope as § 841(a)(1). Rather, § 860 mandates a double penalty for (1) unlawful distribution of a controlled substance; (2) unlawful manufacture of a controlled substance; or (3) unlawful possession with intent to distribute a controlled substance. On its face, "[Section 860] does not provide for an enhanced penalty for someone who violates § 841(a)(1) by *dispensing* a controlled substance within 1000 feet of a school." *United States v. Ekinci*, 101 F.3d 838, 841 (2d Cir.1996) (emphasis added).

Section 860's legislative history suggests that Congress did not accidentally omit "dispensing" from the statute. *Id.* It appears that Congress never intended for the double penalty provision to apply to dispensing, the conduct at issue in this case. *Id.* When first enacted, § 860 provided enhanced penalties for distribution, the first type of proscribed conduct listed in § 841(a)(1). *Id.* Since then, Congress has amended the statute twice: once to include "manufacturing," and a second time to include "possession with intent to distribute." *Id.* To date, Congress has not expanded § 860 to include dispensing of controlled substances. Moreover, Congress seems to have drawn a distinction between "distributing" and "dispensing," as is evidenced by (1) § 802's differing definitions for the terms, (2) the inclusion of both "distributing" and "dispensing" in § 841(a)(1), and (3) § 860's legislative history.

Given the distinct meanings assigned to "distributing" and "dispensing" in § 802, the Government may not charge the defendant with *distribution by dispensing* controlled substances in violation of § 841(a)(1). Because § 860 only prohibits *distribution* of controlled substances, and the indictment only properly charges *dispensing* of controlled substances in violation of § 841(a)(1), the Court **FINDS** that the defendant may not be charged under 21 U.S.C. § 860. The Court's finding does not require that the case be sent back to the grand jury. This Court may order improper portions of an indictment stricken if the defendant faces fewer charges as a result of the amendment. *United States v. Miller*, 471 U.S. 130, 144–45, 105 S.Ct. 1811, 1819–20, 85 L.Ed.2d 99 (1985). Judicial amendment of an indictment is only improper when it results in additional

charges not passed on by the grand jury. *Id.*

## Conclusion

For the reasons stated herein, the defendant's motion to suppress evidence is **DENIED.** The defendant's motion to dismiss counts twenty-five through thirty-five of the indictment is **GRANTED** in part. The Court **ORDERS** that all references to "distribution" and 21 U.S.C. § 860, and the language, "within one thousand (1,000) feet of the real property comprising a public secondary school, namely, Wahama High School," be stricken from the indictment. In all other respects, the defendant's motion to dismiss counts twenty-five through thirty-five of the indictment is **DENIED.**