**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4343**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

QUINTIN ANTONIO BELL, a/k/a Quinton Antonio Bell, a/k/a Quinten Antonio Bell, a/k/a Go-Go,

    Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George Jarrod Hazel, District Judge. (8:14-cr-00531-GJH-1)

Argued: March 22, 2018                           Decided: August 28, 2018

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Diaz joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:** Kian James Hudson, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., for Appellant. Michael Thomas Packard, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Baltimore, Maryland, Paresh Patel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland; Miguel A. Estrada, Russell B. Balikian, Nathan H. Jack, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant. Stephen M. Schenning, Acting

United States Attorney, Daniel C. Gardner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————

NIEMEYER, Circuit Judge:

Following a six-day trial, a jury convicted Quintin Bell of (1) possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute a quantity of heroin and cocaine base, in violation of 21 U.S.C. § 841(a)(1); (3) possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1); and (4) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Based on Bell's prior convictions, the district court sentenced Bell to a mandatory minimum sentence of 480 months' imprisonment.

On appeal, Bell contends that the district court erred (1) in denying his motion to suppress statements he made to officers executing a search warrant for his residence; (2) in admitting "other acts" evidence under Federal Rule of Evidence 404(b); (3) in denying his motion to disclose the identity of a confidential informant who provided information used to obtain the search warrant; and (4) in enhancing his sentence on the basis of his prior convictions.

For the reasons that follow, we affirm.

I

On April 9, 2014, an ATF task force consisting of federal and state law enforcement officers obtained a "no-knock" warrant from the Circuit Court of Prince George's County, Maryland, to search 5404 Morton Place in Riverdale, Maryland, and to seize from the house any narcotics, firearms, and related items found. The probable cause for the warrant was based on the affidavit of ATF Special Agent Frank Oliver, who

3

had learned from a confidential informant ("CI-1") that Bell was "utilizing the residence to sell and store large quantities of Heroin while armed with a firearm." The warrant application recounted that CI-1 had recently visited Bell's residence and "observed, inside a room of the residence, a firearm and a quantity of heroin, consistent with distribution amounts." It further stated that the informant had been shown a police photograph of Bell and had "positively identified" him as "the individual utilizing [the residence] to sell . . . Heroin."

The next morning, April 10, 2014, officers of the Prince George's Police Department made a forced entry into 5404 Morton Place to execute the warrant and, while performing a security sweep, found Bell in the basement and placed him in handcuffs. They led him upstairs to the living room and seated him in a chair near his wife, Stacy Bell ("Stacy"), who had also been handcuffed and seated in a chair. After the house was secured, Agent Oliver entered the living room and, knowing that Stacy was the owner of the house, informed her "that [he] had a narcotics search warrant for the home" and then asked her, in the interest of officer safety, "if there [were] any weapons in the house that would hurt an officer." Before Stacy could respond, however, Bell interjected, stating that "there was a gun under the couch" next to them and that "a friend had given him the gun [after] somebody had tried to break into the house and rob him." Officers then searched under the living-room couch and recovered a Mini-14 Ruger semi-automatic rifle.

The ATF task force proceeded to search the house, recovering extensive evidence of drug trafficking. In the basement, where Bell was found, officers found approximately

4

112 grams of heroin and various drug-trafficking paraphernalia, including a digital scale, empty pill capsules, a capsule-filling device, and bottles of cutting agents. They also found a loaded rifle magazine that was compatible with the Mini-14 Ruger rifle. In the master bedroom upstairs, the officers found in a nightstand several more grams of heroin, another scale, approximately $2,000 in cash, a letter addressed to Bell, and Bell's driver's license. And in a separate bedroom, they found in a filing cabinet approximately $10,000 in cash and a collection of jewelry. Upon completion of the search, the task force released Bell from custody, pursuant to the "request of another [law enforcement] agency."

Some four months later, on August 24, 2014, officers of the Metropolitan Police Department of the District of Columbia ("MPD") received a tip leading them to investigate a parked car in Southeast Washington, D.C. Bell was in the car, accompanied by two others. As the officers approached, Bell opened his door and attempted to exit but was apprehended. The officers found a loaded Glock pistol next to the driver's seat, where Bell had been sitting, as well as approximately $1,000 in cash on Bell's person. They also found several small baggies of marijuana, heroin, and crack cocaine in the car's center console. One baggie containing marijuana was imprinted with green dollar signs, and another baggie containing heroin was imprinted with blue caricatures of a devil's face.

After the MPD officers brought Bell back to the station, a detective advised him of his *Miranda* rights and then interviewed him. During the interview, which was recorded by video, Bell stated that he had been "sharing" the Glock pistol with another man in the

5

car; that the two of them had been "hustlin[g] together" when they were arrested; that he had come to Washington, D.C., that evening to buy "two guns and some coke"; and that, in particular, he was expecting to buy "two Rugers." Bell was charged in the Superior Court of the District of Columbia with several offenses relating to this incident, but the government subsequently decided not to prosecute him in the District of Columbia and dismissed the charges.

Five days later, on August 29, 2014, while Bell was still in custody in Washington, D.C., the ATF task force executed a second search warrant at 5404 Morton Place. Probable cause for this warrant was based on Bell's Washington, D.C. arrest, the evidence from the initial search in April 2014, and CI-1's assertion that Bell was "storing quantities of heroin within [the] residence . . . consistent with distribution amounts." During this search, officers found 14 grams of heroin and 3 grams of crack cocaine in the basement, as well as baggies marked with green dollar signs and blue devil faces. Elsewhere in Bell's residence, they again recovered other evidence of drug trafficking, including digital scales, bottles of cutting agent, and handgun ammunition hidden inside a crockpot.

In November 2014, a grand jury indicted Bell on four counts for drug trafficking and the illegal possession of a firearm. Bell filed a pretrial motion to suppress the statements he made to Agent Oliver during the April 2014 search of his residence, when he admitted to possession of the Ruger rifle, contending that the statements were obtained in violation of *Miranda*. He also filed a motion to compel disclosure of the identity of CI-1 or, in the alternative, for an *in camera* examination of the informant to determine

whether disclosure was warranted. Also prior to trial, the government filed a motion to admit evidence under Federal Rule of Evidence 404(b) of Bell's arrest in Washington, D.C., including the video of his interview.

Following a two-day hearing on these pretrial motions, the district court denied Bell's motion to suppress, stating that Agent Oliver had testified credibly about the April 2014 search; that Oliver had directed his question about weapons in the house to Stacy; and that Bell had then volunteered the answer. The court thus concluded that Bell was not interrogated in violation of *Miranda*. The court also denied Bell's motion to disclose the identity of CI-1, explaining that Bell had failed to meet his burden to pierce the informer's privilege or to obtain an *in camera* examination of the informant that would risk disclosure of his or her identity. Finally, the court granted the government's motion to admit evidence of Bell's arrest in Washington, D.C., concluding that the evidence was reliable and relevant to showing Bell's knowing possession of the rifle and drugs found in his residence and that any prejudice to Bell would be outweighed by the evidence's probative value.

Following trial, the jury convicted Bell on all charges.

The probation officer prepared a presentence report noting Bell's several prior convictions, on which the government relied to argue that he was an "armed career criminal" subject to a 15-year mandatory minimum sentence for his conviction under 18 U.S.C. § 922(g)(1) (firearm possession as a felon). *See* 18 U.S.C. § 924(e). The report also noted that Bell's conviction under 18 U.S.C. § 924(c) for possession of a firearm in furtherance of drug trafficking subjected him to a mandatory minimum consecutive

7

sentence of 25 years' imprisonment because he had a prior conviction under § 924(c). Finally, the report classified Bell, based on his prior convictions, as a career offender under U.S.S.G. § 4B1.1. Combining an offense level of 34 and a criminal history Category VI with a second § 924(c) conviction resulted in an advisory Sentencing Guidelines range of 562 to 627 months' imprisonment, and Bell's statutory mandatory minimum sentence was 480 months' imprisonment.

Bell objected to the calculation of his Guidelines sentencing range and to the statutory mandatory minimum sentence, arguing that his predicate convictions did not qualify him as either an armed career criminal or a career offender. He argued further that the statutory mandatory minimum sentences could not constitutionally be applied to him because the fact of his prior convictions had neither been charged in the indictment nor found by the jury beyond a reasonable doubt. The district court rejected Bell's arguments and sentenced him to 480 months' imprisonment.

This appeal followed.

II

Bell contends first that the district court erred in denying his motion to suppress the statements he made on April 10, 2014, during the execution of the first search warrant for 5404 Morton Place. During the course of that search and after Agent Oliver asked Bell's wife, Stacy, "if there [were] any weapons in the house that would hurt an officer," Bell interjected that there was a Ruger rifle under the couch. Bell notes that he and Stacy "were being held together, next to each other"; that "it is commonplace for [married]

8

couples to jointly answer questions about matters within their individual knowledge, even when a question is directed only to one of them"; and that Agent Oliver "did not specify whether [Bell] or [Stacy] should respond" to his question. Accordingly, he claims that Agent Oliver's questioning *of Stacy* constituted interrogation *of him*, relying on *Rhode Island v. Innis*, 446 U.S. 291 (1980), to argue that, in those circumstances, Oliver "should have known . . . that [the questioning] was reasonably likely to elicit an incriminating response from Mr. Bell." Thus, Bell maintains, because he responded to interrogation while in custody without having been given the required *Miranda* warnings, his motion to suppress should have been granted.

At the pretrial hearing, Agent Oliver described the April 10 encounter in some detail, testifying that after he entered the living room from outside the house, he approached Stacy, because she was the owner of the house, and "informed [her]" that the officers had "a narcotics search warrant for the home." He then asked her, out of "concern[] for officer safety," "if there [were] any weapons in the house that would hurt an officer." According to Agent Oliver, in posing this question to Stacy, he walked to "[w]ithin a couple feet" of her and "directed [his] question to [her] . . . directly," "looking at her in the eye." At the time, Stacy was handcuffed and seated in a chair in the living room. Bell, who was also handcuffed, was seated in "another chair off to the right, behind her chair," and the two chairs were "in close proximity" to each other. After Agent Oliver directed the question to Stacy, however, and before she could answer, Bell stated that "there was a gun under the couch." When the officers looked under the couch,

9

they found the Mini-14 Ruger semi-automatic rifle that, Bell explained, a friend had given him.

The district court accepted Agent Oliver's testimony about the encounter, stating that he credited, as a factual matter, "Agent Oliver's testimony that he did direct the question at Ms. Bell and that the defendant then volunteered an answer." The court thus concluded that although Bell "was in custody, he was not being interrogated" and that his statements were therefore "admissible even though *Miranda* had not been given."

To safeguard the protection against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court in *Miranda* adopted a set of procedural rules that apply when a suspect is subjected to custodial interrogation, including the familiar requirements that he be informed of his "right to remain silent, that any statement he [makes] may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). And the Court has stated, in applying *Miranda* to circumstances similar to those before us, that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its *functional equivalent*." *Innis*, 446 U.S. at 300. "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response from the suspect*." *Id*. at 301 (emphasis added); *see also id*. at 301 & n.7 (explaining that "[t]he latter portion of this definition focuses primarily upon

10

the perceptions of the suspect," but that "the intent of the police . . . may well have a bearing on" the inquiry).

In *Innis*, the defendant was arrested for a robbery that had been committed hours before with a shotgun. *See* 446 U.S. at 293–94. After Innis received his *Miranda* warnings and invoked his right to counsel, officers took him to the station in a police car, and on the way, he overheard two officers discussing the need to find the shotgun because there was a school for handicapped children located nearby and one of the children could find the gun and hurt himself. Innis interrupted their conversation, stating that he knew where the gun was located, and then led the officers to it. *Id*. at 294–95. On those facts, the Supreme Court rejected the Rhode Island Supreme Court's conclusion that Innis's statement was the product of "subtle coercion" equivalent to "interrogation," in violation of *Miranda*. *Id*. at 296, 303. The Court noted that the officers had not expressly questioned Innis as they had spoken only to each other. *Id*. at 302. And it further concluded that the officers' conversation did not amount to the "functional equivalent" of questioning, as the "entire conversation . . . consisted of no more than a few off hand remarks"; that the remarks were not "particularly 'evocative'"; that Innis was not "unusually disoriented or upset at the time"; and that the officers had no reason to believe Innis "was peculiarly [concerned for] the safety of handicapped children." *Id.* at 302–03. Thus, while recognizing that the officers' remarks presumably subjected Innis to "subtle compulsion," the Court held nonetheless that their conversation did not amount to prohibited interrogation, as "it [could not] be said . . . that [the officers] should have

11

known that their conversation was reasonably likely to elicit an incriminating response."

*Id.*

In this case, as in *Innis*, it is apparent that Bell was subjected to neither express questioning nor its functional equivalent. Agent Oliver focused directly on Stacy as the owner of the house, looked her in the eye, and asked her a single question relating to officer safety — whether there "w[ere] any weapons in the house that would hurt an officer." The question was not posed to Bell and did not seek a response from him, nor was there any evidence that it was intended to. Moreover, nothing in the formulation of the question would suggest that it invited a response from anyone other than Stacy. In short, the record hardly supports Bell's claim that the question, in the circumstances, was likely to elicit from him a statement implicating himself in the illegal possession of a firearm. To be sure, Bell was within earshot, and thus it was within the realm of possibility that he would interject to answer the question. But a conclusion that Agent Oliver *should have known* that his question to Stacy was likely to prompt an incriminatory response from Bell cannot be reconciled with the record before us, including the district court's factual findings, which Bell does not challenge. Nor could such a conclusion be reconciled with the holding of *Innis*.

*Innis*'s articulation of the *Miranda* rule as applying not only to express questioning but also to its "functional equivalent" reflected the Supreme Court's concern that certain conduct by the police could be designed to have the same coercive effect as conventional interrogation. To illustrate, the Court gave as examples several "techniques of persuasion," such as using a "coached witness" to pick the suspect out of a police lineup,

12

or accusing him of a "fictitious crime" in order to induce his confession to the actual crime under investigation. *Innis*, 446 U.S. at 299. The *Innis* rule thus encompasses "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response," *id*. at 301, but it also recognizes that an officer's conduct does not give rise to "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, [unless it] reflect[s] *a measure of compulsion above and beyond that inherent in custody itself*." *Id*. at 300 (emphasis added). Indeed, in applying this standard, the Court emphasized that even though "it may be said" that officers had subjected Innis to "subtle compulsion," that alone was insufficient to qualify the officers' remarks as interrogation. *Id*. at 303.

Here too, the record before us falls well short of establishing that Bell was subject to anything beyond the compulsion inherent in custody itself or the "subtle compulsion" accepted in *Innis*. It can hardly be said that overhearing a single question posed to one's spouse creates the necessary level of compulsion without more. To the contrary, the district court found as fact that Bell had "volunteered" his answer to the question directed to Stacy. At bottom, we cannot conclude that Agent Oliver's single question to Stacy resulted in the degree of coercion for it to constitute the functional equivalent of express questioning, as would make Bell's self-incrimination likely enough that Oliver should have foreseen it. *See Innis*, 446 U.S. at 301–02 (noting that "the police surely cannot be held accountable for the unforeseeable results of their words or actions"); *United States v. Johnson*, 734 F.3d 270, 277 (4th Cir. 2013) ("*Innis* rejects [the] possibility [of self-incrimination] in favor of foreseeability").

We therefore affirm the district court's ruling on Bell's motion to suppress.

13

III

Bell contends next that the district court abused its discretion in admitting evidence about his August 24, 2014 arrest in Washington, D.C., particularly the video of his police interview and the testimony of the MPD officers who arrested Bell relating how Bell was seated next to a Glock handgun and several bags of illegal drugs. Because Bell was not charged for this conduct, the district court admitted the evidence under Federal Rule of Evidence 404(b) as proof that Bell knowingly possessed the drugs and Ruger rifle recovered from the April and August 2014 searches of his Maryland residence. Bell argues that, "as compared to the charged conduct [in Maryland], the [Washington, D.C.] incident involved a different gun and categorically different quantities of drugs found in . . . a different context," and thus the evidence could only be relevant to establish his criminal propensity, a prohibited ground for the admission of such evidence under Rule 404(b). He argues further that, even if the evidence had some marginal relevance, it should have been excluded under Rule 403 because "that relevance was vastly overshadowed by the danger of unfair prejudice [to him]."

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's *character* in order to show that on a particular occasion the person acted in accordance with the character" (emphasis added), but that such evidence may nonetheless be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." It is thus a rule of inclusion because it "recognizes the admissibility of prior

14

crimes, wrongs, or acts, with only the one stated exception." *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997).

To admit evidence of uncharged crimes under Rules 404(b) and 403, we have held that it must satisfy the following criteria:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. . . . (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*Queen*, 132 F.3d at 997; *see also United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010). And the unfair prejudice is not shown merely because the evidence is damaging to a defendant's case, since "highly probative [evidence] invariably will be prejudicial to the defense." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation marks and citation omitted).

In this case, we readily conclude that the district court did not abuse its discretion in admitting the Washington, D.C. evidence. The video of Bell's police interview — in which he stated that he had been "sharing" the handgun with a companion as they "hustl[ed] together," and that he was expecting to buy "some coke" and "two Rugers" — was plainly necessary and relevant to showing that Bell had, as charged, possessed the Ruger rifle in furtherance of drug trafficking four months earlier. And the MPD officers' testimony, recounting how Bell was arrested with heroin, marijuana, and crack cocaine, packaged in distinctively marked baggies, was similarly probative. Indeed, those same narcotics, and the same baggies, were discovered in Bell's basement the very next week.

15

Rather than merely establishing a propensity to commit crimes, the Washington, D.C. evidence was persuasive proof that Bell had, as alleged in the indictment, knowingly possessed the illegal drugs in his residence with the intent to distribute them and that he had knowingly possessed the Ruger rifle in furtherance of his drug-trafficking activity. Bell's character was not at issue and the evidence was not admitted to prove his character. But intent and motive were at issue, and evidence of both were admissible under Rule 404(b). Finally, Bell makes no claim that the Washington, D.C. evidence was unreliable.

As to Bell's claimed unfair prejudice under Rule 403, nothing in the record suggests that admitting the Washington, D.C. evidence created confusion or tended to subordinate reason to emotion in the jury's factfinding process. Moreover, Bell was notified before trial of the government's intent to use the Washington, D.C. evidence, and the district court gave appropriate limiting instructions to the jury, explaining that the evidence could only be considered to infer his intent to commit the crimes alleged in his indictment. *See Queen*, 132 F.3d at 997–98.

Nonetheless, Bell argues that our decision in *United States v. Hall*, 858 F.3d 254 (4th Cir. 2017), compels us to reach a contrary conclusion. In *Hall*, the defendant was convicted of possession with intent to distribute marijuana and related firearm offenses after the district court admitted, as evidence of knowledge and intent under Rule 404(b), his several prior marijuana convictions. The prior convictions, however, all predated the offenses in Hall's indictment by at least five years, and the government provided *only* the date and statutory citation of each conviction without offering "any [other] information

16

regarding the circumstances giving rise to the convictions." *Id.* at 262. We held that the district court had abused its discretion because the defendant's criminal history was either irrelevant to the purpose for which it had been admitted or, for certain purposes, so marginally relevant and unduly prejudicial as to violate Rule 403. *Id.* at 268–76. Our holding in *Hall*, however, is far afield, as the evidence admitted there was the bare fact of the defendant's convictions from more than a half-decade before. In this case, by contrast, the evidence at issue is the defendant's own conduct and statements, which had a close factual and temporal nexus to the crimes charged in the indictment. Bell's reliance on *Hall* is thus unavailing.

We therefore conclude that the district court did not abuse its discretion in admitting the evidence of Bell's arrest in Washington, D.C.

IV

For his final challenge to his conviction, Bell contends that the district court erred in denying his motion to compel disclosure of the identity of the confidential informant who supplied law enforcement with information used to obtain the search warrants for his residence or, in the alternative, to have the district court conduct an *in camera* examination of the informant to determine whether disclosure was warranted. He argues that the crux of his defense was that the contraband at his residence actually belonged to Steven Wise, a heroin addict who assertedly had been living in Bell's basement prior to his death in August 2014. In light of Wise's unavailability as a witness, Bell maintains that he was entitled to pierce the informer's privilege so that he would have an

17

opportunity to examine the informant at trial, as this "could establish that the informant [had] mistakenly identified Mr. Bell [to law enforcement] and that the contraband actually was possessed by Mr. Wise." By denying his motion, Bell argues, the district court foreclosed his ability to offer testimony that was "essential to a fair determination of [his] case."

The district court denied Bell's motion because Bell had failed to meet his "heavy burden to demonstrate the need for identification," as would allow him to pierce the informer's privilege.

The "informer's privilege," which protects a confidential informant's identity, "is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information [about crimes]" to law enforcement. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). In *Roviaro*, the Court declined to adopt a bright-line rule for determining when a defendant may pierce the privilege, stating that the issue instead calls for case-by-case "balancing [of] the public interest in protecting the flow of information [to law enforcement] against the individual's right to prepare his defense." *Id.* at 62. Whether disclosure should be ordered therefore depends "on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* And in applying *Roviaro*, we have held more particularly that "the government is privileged to withhold the identity of [an] informant when [he] was a 'mere tipster,' or was used only for obtaining a search warrant, but that failing to disclose the informant's identity more likely amounts to error when the informant was *an active participant* in the events

18

leading to the arrest of the accused." *United States v. Gray*, 47 F.3d 1359, 1365 (4th Cir. 1995) (emphasis added) (citations omitted).

In this case, we cannot conclude that the district court abused its discretion in refusing to disclose the identity of CI-1, the confidential informant who supplied information used by law enforcement to obtain the two warrants for the search of Bell's residence. Other than providing information for the search warrants — namely, that the informant had recently observed Bell "inside a room of the residence, [with] a firearm and a quantity of heroin . . . consistent with distribution amounts" — the informant apparently had no role in Bell's crimes or his prosecution. The informant did not participate in the offenses charged in Bell's indictment, which arose from Bell's possession of narcotics and a firearm at times when the informant was not present, nor was the informant even mentioned to the jury at trial. Moreover, the assertion that the informant might have testified that it was Wise, not Bell, who had stockpiled illegal drugs at Bell's residence — in flat contradiction to the representations in the warrant affidavits — appears dubious, if not entirely speculative. In short, Bell has identified nothing in this case to exempt it from the "well settled principle that the government is permitted to withhold the identity of a confidential informant when 'the informant was used only for the limited purpose of obtaining a search warrant.'" *Gray*, 47 F.3d at 1365 (quoting *United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973)).

We also find no fault in the district court's refusal to convene an *in camera* proceeding to explore this issue further. Under the circumstances, the court was entitled

to conclude that any marginal benefit to Bell from such a proceeding would not be worth the added risk of disclosure of the informant's identity.

The cases on which Bell relies to argue that disclosure is nonetheless required are materially distinguishable in that the confidential informants in those cases were intimately involved in the crimes that were to be proved at trial. *See McLawhorn v. North Carolina*, 484 F.2d 1, 6 (1973) (officers used informant to set up a controlled purchase of narcotics from the defendant); *United States v. Price*, 783 F.2d 1132, 1139 (4th Cir. 1986) ("[T]he informant in this case did much more than tip off the government. . . . [He] set up the deal [and] was a necessary party to the telephone negotiations which led to the attempted [contraband] sale"). In such a case, the defendant has a colorable claim that the informant's identity is necessary to a fair determination of his guilt or innocence. *See Roviaro*, 353 U.S. at 64–65. But, as we have explained, Bell cannot make any such claim.

V

In challenging his 480-month prison sentence, Bell contends that, in concluding that he was subject to mandatory minimum sentences based on prior convictions, the district court erred in finding the fact of his prior convictions rather than submitting the issue to the jury. This error, he argues, violated his Sixth Amendment rights.

Bell's argument, however, is foreclosed by the Supreme Court's decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), where the Court recognized an exception to the Sixth Amendment that permits a sentencing judge to find the fact of a

20

defendant's prior convictions instead of a jury, even when this fact increases the statutory maximum or minimum penalty. *Id.* at 247; *United States v. McDowell*, 745 F.3d 115, 123 (4th Cir. 2014). Bell nonetheless argues that the *Almendarez-Torres* exception is "flatly inconsistent" with the Supreme Court's subsequent decision in *Alleyne v. United States*, which held "that facts that increase mandatory minimum sentences must be submitted to the jury." 570 U.S. 99, 116 (2013). The *Alleyne* Court, however, expressly exempted "the fact of a prior conviction" from its holding, leaving intact the "narrow exception" to the Sixth Amendment recognized in *Almendarez-Torres*. *Id.* at 111 n.1; *see also McDowell*, 745 F.3d at 124 (noting that "*Almendarez-Torres* remains good law [even after *Alleyne*], and we may not disregard it unless and until the Supreme Court holds to the contrary").

VI

In challenging his sentence, Bell also contends that the district court erred in relying on prior convictions that did not qualify as predicate offenses to conclude that he was subject to a mandatory minimum sentence of 40 years' imprisonment.

The district court imposed a 40-year mandatory minimum sentence by adding together two components: (1) a 15-year mandatory minimum sentence for his § 922(g)(1) conviction because Bell had at least three prior convictions "for a violent felony or a serious drug offense" under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1); and (2) a consecutive 25-year mandatory minimum sentence for his § 924(c) conviction because Bell had a prior § 924(c) conviction, *see* § 924(c)(1)(C)(i),

(D). To satisfy the requirement of three qualifying prior convictions under § 924(e)(1), the district court relied on two 1985 Maryland convictions for "robbery with a deadly weapon" and a 1991 federal conviction for "possession with intent to distribute — cocaine base."

Bell's challenge focuses only on the two 1985 Maryland convictions for "robbery with a deadly weapon." He contends that those two convictions do not qualify as predicate convictions under § 924(e) because, as he argues, the offense "does not have as an element the use or threatened use of violent force against a person, as required by the ACCA [§ 924(e)]," in that "it can be accomplished with force to property, and it can be accomplished with non-violent (*i.e.*, de minimis) force against a person."

Section 924(e) provides that any "person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony or a serious drug offense, or both, . . . shall be . . . imprisoned not less than fifteen years." 18 U.S.C. § 924(e)(1). The term "violent felony" is defined, as relevant here, as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). To determine whether a prior conviction satisfies this definition of a violent felony — known as the "force clause" — we apply the categorical approach. *See United States v. Reid*, 861 F.3d 523, 527 (4th Cir. 2017). Under this approach, we do not look to the facts underlying the prior conviction but must instead determine whether the prior offense *by its elements* involves "the use, attempted use, or threatened use of physical force against the person of another." And the term "physical force," in the

22

context of describing a *violent* felony, entails more than the "mere unwanted touching" necessary to prove common law battery, *Johnson v. United States*, 559 U.S. 133, 142 (2010); rather, it is understood to mean "*violent* force — that is, force capable of causing physical pain or injury to another person," *id.* at 140.

In determining whether a state offense encompasses the use of such force as an element, we look to state law and "the interpretation of [the] offense articulated by that state's courts." *United States v. Winston*, 850 F.3d 677, 684 (4th Cir. 2017) (citations omitted). But the determination of whether the elements of a state offense qualify under the force clause is a question of federal law. *See Taylor v. United States*, 495 U.S. 575, 590–92 (1990). As the Supreme Court has stated, "[T]he label a State assigns to a crime . . . has no relevance to whether that offense is an ACCA predicate." *Mathis v. United States*, 136 S. Ct. 2243, 2251 (2016) (citing *Taylor*, 495 U.S. at 590–92).

In this case, Bell was twice previously convicted in Maryland state court for "robbery with a deadly weapon." Robbery in Maryland is a common law crime defined as "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Williams v. State*, 490 A.2d 1277, 1280 (Md. 1985). At the time of Bell's convictions, the offense of common law robbery was incorporated into two provisions of the Maryland Code. The first, Maryland Code, Article 27 § 486 (now repealed), provided:

> Every person convicted of the crime of robbery, or as accessory thereto before the fact, shall . . . be sentenced to the penitentiary for not less than three nor more than ten years.

And the second, Maryland Code, Article 27 § 488 (now repealed), provided:

> Every person convicted of the crime of robbery or attempt to rob *with a dangerous or deadly weapon* or accessory thereto, shall . . . be sentenced to imprisonment in the Maryland Penitentiary for not more than twenty years.

As Bell was sentenced to 20 years' imprisonment (with 8 years suspended) for each of his two Maryland robbery convictions, he does not dispute that he was therefore convicted under § 488.[*]

Bell contends that despite the two distinctly numbered sections for simple and armed robbery, providing for two distinct punishments, Maryland nonetheless recognizes only one crime of robbery that can be committed with *de minimis* force or with force directed solely against property, either of which would disqualify it as a predicate offense under ACCA's force clause. To make his argument, he relies on statements made by the Maryland Court of Appeals that have described the "dangerous or deadly weapon" component of § 488 as a *sentence enhancement* for the "single common law offense" of simple robbery, as opposed to an *element* of the distinct crime of armed robbery. *E.g.*, *Whack v. State*, 416 A.2d 265, 266 (Md. 1980) ("In Maryland, robbery is a single common law offense. Article 27, §§ 486 and 488, do not create separate statutory offenses but merely fix the penalties for the one crime of robbery"); *accord Grimes v. State*, 429 A.2d 228, 231 (Md. 1981); *but see Hagans v. State*, 559 A.2d 792, 799 (Md. 1989) (noting that "armed robbery and basic robbery . . . [are], for some purposes . . .

---

[*] Maryland repealed §§ 486 and 488 in 2002 but generally retained common law robbery and the substance of §§ 486 and 488 in a recodification. *See* Md. Code Crim. Law §§ 3-401(e) (providing that robbery "retains its judicially defined meaning," with certain enumerated exceptions), 3-402 (addressing simple robbery), 3-403 (addressing armed robbery); *see also Spencer v. State*, 30 A.3d 891, 895 (Md. 2011).

24

regarded as separate offenses[,] with robbery being the lesser included offense of armed robbery"); *Sweetwine v. State*, 421 A.2d 60, 61 n.1 (Md. 1980) (same). Thus, Bell asserts that we cannot consider whether *armed* robbery by its elements satisfies the force clause because it is subsumed within the "single . . . offense" of *simple* common law robbery.

Despite what *Whack* and similar Maryland cases have said, however, Maryland uniformly treats the dangerous or deadly weapon component in § 488 as a distinct element of a separate crime, as understood under federal law. The Maryland courts have invariably required the "dangerous or deadly weapon" component to be pled in the indictment and proven to the jury beyond a reasonable doubt. *See Sweetwine*, 421 A.2d at 61 n.1 ("[B]ecause armed robbery requires proof of an additional element, the offenses are distinct"); *Bynum v. State*, 357 A.2d 339, 340–41 (Md. 1976) (noting separate counts in indictment for simple and armed robbery); *Battle v. State*, 499 A.2d 200, 203 (Md. Ct. Spec. App. 1985) ("[T]he State must prove *beyond a reasonable doubt*, number one, that there was a robbery, and number two, that it was committed with the use of a deadly or dangerous weapon" (emphasis added) (quoting trial court's jury instructions))); *see also Wadlow v. State*, 642 A.2d 213, 216 (Md. 1994) ("[R]obbery is ordinarily characterized as one offense, with the division between armed robbery and simple robbery being for the purpose of punishment, . . . but the charge must be specific and the determination of the seriousness of the offense is for the trier of fact" (citing *Hook v. State*, 553 A.2d 233, 236 n.10 (Md. 1989)). And the Maryland pattern jury instructions — in the version applicable during the period when Bell was convicted — similarly made clear that the use of a deadly weapon in a robbery is a separate element to be proved to the jury. *Compare*

25

Md. Crim. Jury Inst. & Comm., § 4.82 (1975) (simple robbery) *with id*. § 4.83 (armed robbery) ("In order for the defendant to be found guilty of [armed robbery], the state must prove beyond a reasonable doubt: (1) that there was a robbery; and (2) *that it was committed with the use of a deadly or dangerous weapon*" (emphasis added)). Thus, while Maryland has described § 488 as providing for a sentencing enhancement when a deadly weapon is used in a robbery, it has treated the use of a weapon as a separate "element" as that term is understood under federal law. "Elements," after all, "are the 'constituent parts' of a crime's legal definition — the things the 'prosecution must prove to sustain a conviction.'" *Mathis*, 136 S. Ct. at 2248 (quoting Black's Law Dictionary 634 (10th ed. 2014)). And when § 488 applies, the defendant's maximum sentence increases from 10 to 20 years' imprisonment. *See id.* at 2256 (noting, for purposes of the categorical approach, that "[i]f statutory alternatives carry different punishments, then . . . they must be elements [as opposed to means]"). Since the determination of whether an offense qualifies under ACCA's force clause is a question of federal law, we conclude that § 488 defined a separate crime, with a separate element and a separate punishment, distinct from simple robbery, which was addressed in § 486.

Thus, the offense of *armed* robbery in Maryland requires the prosecution to prove that the defendant committed (1) "[a] felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear," (2) while using a "dangerous or deadly weapon." *Williams*, 490 A.2d at 1280; Md. Code, Art. 27 § 488 (repealed). And for a weapon to qualify as "dangerous or deadly," "the instrument must be (1) designed as 'anything used or designed to be used in destroying,

defeating, or injuring an enemy, or as an instrument of . . . combat'; (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm . . . ; or (3) actually used in a way likely to inflict that sort of harm." *Brooks v. State*, 552 A.2d 872, 880 (Md. 1989) (quoting *Bennett v. State*, 205 A.2d 393, 394 (Md. 1964)). With these elements defined by state law, we readily conclude that, as a matter of federal law, the crime of Maryland armed robbery "has as an element the use, attempted use, or threatened use of physical force against the person of another," in the sense that the force is "capable of causing physical pain or injury," *Johnson*, 559 U.S. at 140, and that therefore it is a violent felony under 18 U.S.C. § 924(e).

Bell argues nonetheless that Maryland armed robbery could be committed with only *de minimis* force, proffering a hypothetical defendant who "uses an axe to break into a store and then snatches merchandise from the shop owner's hand" or who "use[s] a knife to cut the victim's purse strap [before] yank[ing] it off her shoulder." It is doubtful, to say the least, that those hypotheticals would actually support a conviction under § 488. But more importantly, Bell does not identify any *actual* defendant from a Maryland case who has been prosecuted in such circumstances. Yet, in determining the "minimum conduct" that satisfies a state offense, as the categorical approach requires, we must ensure "there is a 'realistic probability, not [just] a theoretical possibility,' that a State would actually punish that conduct." *United States v. Gardner*, 823 F.3d 793, 803 (4th Cir. 2016) (quoting *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684–85 (2013)).

Bell also argues that the force required to commit Maryland armed robbery can be directed solely *against property*, giving the example of a defendant who uses a firearm

27

"to threaten the victim's dog or car," thereby effecting a robbery of the victim without threatening force against his person. In making this argument, Bell relies on *Giles v. State*, 261 A.2d 806, 807 (Md. Ct. Spec. App. 1970) (stating that the "fear" required to commit common law robbery "may be of injury to the person *or to property*, as for example, a threat to burn down a house" (emphasis added)), and *Douglas v. State*, 267 A.2d 291, 295 (Md. Ct. Spec. App. 1970) (same). In *Giles*, however, the court held that there was sufficient evidence to support a finding that the defendant had committed robbery through "actual violence" directed *at the victim's person*, given that the victim had been "grabbed and pushed" during a "tussl[e]." 261 A.2d at 808. And in *Douglas*, the court affirmed the defendant's robbery conviction for holding up an office clerk, holding that there was no error in a jury instruction stating that robbery by constructive force requires a "threat of violence," rather than "fear of great bodily harm," as the defendant had argued. 267 A.2d at 294–95. Thus, the actual holdings in those cases — both of which addressed simple, not armed robbery — hardly provide Bell with support. Moreover, the dicta on which Bell relies have apparently never been repeated by any Maryland court in the nearly five decades since *Douglas* and *Giles* were decided.

More importantly, Bell's hypothetical overlooks *the elements* of armed robbery as defined by the Maryland Court of Appeals. To convict a defendant for armed robbery, the State must prove that he committed (1) "[a] felonious taking and carrying away of the personal property of another *from his person* by the use of violence or by putting in fear," (2) while using a "dangerous or deadly weapon." *Williams*, 490 A.2d at 1280 (emphasis added); Md. Code, Art. 27 § 488 (repealed); *see also West v. State*, 539 A.2d 231, 234

28

(Md. 1988) (explaining that robbery requires "actual" or "constructive" violence; that actual violence "implies *personal* violence"; and that constructive violence is that which "intimidat[es] or plac[es] the *victim* in fear" (emphasis added) (citation omitted)); *Spencer*, 30 A.3d at 898 ("[W]hen considering whether there has been a threat of force or intimidation," a court must "consider whether an ordinary, reasonable person under the circumstances would have been in fear of *bodily harm*" (emphasis added)); *Snowden v. State*, 583 A.2d 1056, 1059 (Md. 1991) ("Robbery is a . . . larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)"). Accordingly, Bell's force-to-property hypothetical again does not serve as a persuasive analysis of the elements of Maryland armed robbery. *See Moncrieffe*, 569 U.S. at 191 (reaffirming that the categorical approach's "focus on the minimum conduct criminalized by the State statute is not an invitation to apply 'legal imagination' to the State offense" and that there instead "must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime'" (citation omitted)); *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) (explaining that to show the requisite "realistic probability," an offender "must at least point to his own case or other cases in which state courts in fact did apply the statute in the special (nongeneric) manner for which he argues").

At bottom, we hold that Bell's two Maryland convictions for robbery with a dangerous or deadly weapon were "violent felon[ies]" as used in § 924(e), and in doing so we join the other Courts of Appeals that have considered this issue and reached the same conclusion. *See United States v. Redrick*, 841 F.3d 478, 485 (D.C. Cir. 2016);

29

*United States v. Warren*, 723 F. App'x 155, 165 (3d Cir. 2018) (unpublished); *see also*

*United States v. Segovia*, 770 F.3d 351, 355 (5th Cir. 2014) (holding that Maryland

armed robbery qualifies under an identical force clause in U.S.S.G. § 2L1.2).

While we acknowledge that Bell also challenges the district court's finding under

U.S.S.G. § 4B1.1 that he qualified as a career offender by relying on his 1991 District of

Columbia conviction for assault with a deadly weapon, in view of our conclusion that

Bell's 480-month sentence was a statutory mandatory minimum sentence, any error in the

career offender classification would not provide Bell with any relief.  We therefore do not

reach the issue.

*     *     *

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

WYNN, Circuit Judge, dissenting:

After a jury convicted Defendant Quintin Antonio Bell ("Defendant") of several drug and firearms offenses, the U.S. District Court for the District of Maryland sentenced Defendant to what the court determined was the mandatory minimum of 480 months' imprisonment. On appeal, Defendant lodges numerous challenges to his convictions and sentence, asserting, among other claims, that the district court (1) reversibly erred in admitting inculpatory statements made by Defendant obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) incorrectly imposed a mandatory minimum sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1), based on Defendant's two prior Maryland armed robbery convictions. I agree with both assertions.

My good colleagues in the majority conclude that the district court properly rejected Defendant's *Miranda* argument because Defendant did not make his inculpatory statements in response to "interrogation" by a law enforcement officer. *Ante* at 9–12. In particular, like the district court, my colleagues conclude that because the law enforcement officer testified that he *intended* to direct the question to which Defendant responded to *Defendant*'s *wife*—who was seated "in close proximity" to Defendant when the officer asked the question—*Defendant* was not subject to "express questioning," therefore rendering *Miranda* inapplicable. But, under *Miranda*, our assessment of whether Defendant was subject to "interrogation" must be analyzed from the *perspective of Defendant*, not the officer who questioned Defendant. Therefore, as explained below,

31

the district court erred by treating as dispositive the officer's testimony that he intended to, and did in fact, direct the question to Defendant's wife.

Additionally, regarding Defendant's sentence, my colleagues in the majority conclude that Defendant's prior Maryland armed robbery convictions had "as an element the use, attempted use, or threatened use of physical force *against the person of another*," as Section 924(e)(1) requires, notwithstanding that Maryland appellate decisions, which remain good law, provide that armed robbery can be committed solely by use or threatened use of force *against property*. *See, e.g.*, *Giles v. State*, 261 A.2d 806, 807 (Md. Ct. Spec. App. 1970). The majority opinion disregards those state court decisions on grounds that the discussion of threats against property amounted to "dicta" and that, under Maryland law, armed robbery typically involves violence against persons. *Ante* at 27–29. But this Court and other courts routinely rely on dicta from state court opinions in determining whether a state offense constitutes a predicate offense for purposes of the ACCA. And this Court has held that when a state offense allowed for conviction solely based on harm to property, the offense did not constitute a crime of violence, even though state law established that the offense was "primar[il]y" intended to protect persons. *See United States v. Parral-Dominguez*, 794 F.3d 440, 445–46 (4th Cir. 2015). Therefore, as explained below, the district court erred regarding Defendant's sentence.

Regarding the resolution of these issues by the majority opinion, I respectfully dissent.[1]

---

[1] I concur in the majority opinion's judgment that the district court did not abuse its discretion in admitting certain evidence under Federal Rule of Evidence 404(b). *Ante* at 14-17. That rule provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but that such evidence may nonetheless be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

Here, the district court did not abuse its discretion in concluding that the testimony regarding Defendant's August 25, 2014, arrest, search, and interrogation in Washington, D.C., because there was an adequate factual basis to conclude that the conduct at issue in that arrest was "part of single criminal episode," *United States v. Chin*, 83 F.3d 83, 87–88 (4th Cir. 1996), and was "necessary to complete the story of the crime at trial," *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted). Most notably, as the majority opinion correctly emphasizes, that the officers found plastic baggies, some of which contained drugs, with the same green dollar sign and blue devil markings in both searches, indicating that both arrests were part of the same series of transactions. Moreover, the two searches of Defendant's home were in close temporal proximity to his arrest.

In rendering its judgment, the majority opinion characterizes Rule 404(b) as "a rule of inclusion." *Ante* at 14. To be sure, this Court has characterized Rule 404(b) as "a rule of inclusion." *United States v. Hall*, 858 F.3d 254, 276–77 (4th Cir. 2017). We have done so to make clear that Rule 404(b)'s "list of proper purposes is not exhaustive." *Id.* at 266, 277 (citing *United States v. Queen*, 132 F.3d 991, 994–95 (4th Cir. 1997). "That characterization does not displace the longstanding rule"—which predates the *Queen* decision referenced by the majority opinion—"that prior 'bad act' evidence is '*generally inadmissible*.'" *Hall*, 858 F.3d at 277 (emphasis added) (quoting *United States v. McBride*, 676 F.3d 385, 395 (4th Cir. 2012)). Accordingly, the majority opinion should not—and cannot—be read as holding that other bad acts evidence is presumptively admissible. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from the court sitting *en banc* or the Supreme Court.").

(Continued)

33

I.

First, the district court erred in refusing to suppress statements Defendant made while in custody, in violation of his Fifth Amendment rights as protected by the prophylactic rule in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* requires "law enforcement to inform individuals who are [1] in custody of their Fifth Amendment rights prior to [2] interrogation." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013). "We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations de novo. When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government." *Id.* (quotation omitted).

A.

In ruling on Defendant's suppression motion, the district court principally relied on the testimony of Bureau of Alcohol, Tobacco, & Firearms Special Agent Frank Oliver,

---

I further concur in the majority opinion's judgment that the district court did not abuse its discretion by refusing to compel the government to disclose the identity of a confidential informant. *Ante* at 17–20. In rendering its judgment, the majority opinion states that "[t]he district court denied [Defendant's] motion because [Defendant] failed to meet his 'heavy burden to demonstrate the need for identification,' as would allow him to pierce the informer's privilege." *Ante* at 18. The majority opinion's reference to a "heavy burden" simply quotes the district court's opinion, it does not state—much less establish—the standard applied by the Supreme Court or this Court in reviewing motions to compel identification of a confidential informant. *Id.* As the majority opinion correctly states, that standard is governed by the balancing test set forth in *Roviaro v. United States*, 353 U.S. 53, 59 (1957), and applied by this Court in *United States v. Gray*, 47 F.3d 1359, 1364–65 (4th Cir. 1995). Neither *Roviaro* nor *Gray* characterize a Defendant's burden in propounding such a motion as "heavy."

which the court found credible. On April 20, 2014—after a Prince George's County Emergency Services Team had "clear[ed] [Defendant's] home, ma[d]e sure it [wa]s safe," and accounted for all individuals—Special Agent Oliver entered Defendant's home to execute a "no knock" search warrant for, among other things, firearms and drugs. J.A. 265, 272. Special Agent Oliver sought and obtained a "no knock" search warrant so as to surprise Defendant and thereby render him in "a state of confusion that w[ould] eliminate the possible use of a firearm." J.A. 61. Special Agent Oliver entered directly into the home's living room, where he found Defendant's wife seated handcuffed in a chair. Emergency Services Team members then brought Defendant, who also was handcuffed, into the living room as well. Defendant was placed in another chair in the living room, which Special Agent Oliver testified was "in close proximity" to the chair in which Defendant's wife was seated. J.A. 278, 282.

Without advising Defendant of his Fifth Amendment rights, Special Agent Oliver then informed Defendant's wife of the search warrant and "asked her if there [were] any weapons or anything that would hurt an officer." J.A. 266. According to Special Agent Oliver's testimony, when he asked that question, he "directed" the question to Defendant's wife, "looking at her in the eye." J.A. 282. Special Agent Oliver did not preface either the statement or the question by stating Defendant's wife's name or instruct only her to answer. J.A. 282–83. Immediately after Special Agent Oliver asked the question, Defendant "spoke up and said there as a gun under the couch." J.A. 391; *see also* J.A. 267. Defendant further stated that a "friend had given him the gun because somebody had tried to break into the house and rob him." J.A. 268.

35

Defendant moved to suppress his statements regarding the gun—a Mini-14 Ruger .223 caliber rifle that served as the basis of Defendant's firearms convictions—under *Miranda*. The parties agreed—and the district court concluded—that Defendant was "in custody" for purposes of *Miranda* when he made the statements. The parties disagreed, however, as to whether Defendant was subject to "interrogation" for purposes of *Miranda* when he made the statements regarding the gun. Ruling from the bench, the district court held that Defendant "was not being interrogated" when he made the statements. J.A. 392. The district court's *entire* explanation for that legal conclusion is as follows:

> Regarding the April 10, 2014 statement in the house, defendant's primary argument is that the question regarding firearms in the house was actually directed at him and not his wife. I do credit, as a factual matter and as a legal matter, Agent Oliver's testimony that he did direct the question at Ms. Bell and that the defendant then volunteered an answer.

*Id.*

B.

In *Rhode Island v. Innis*, the Supreme Court held that a person is subject to "interrogation" for purposes of *Miranda* "whenever a person in custody is subject to either express questioning *or* its functional equivalent." 446 U.S. 291, 301 (1980) (emphasis added); *see also id.* ("[T]he term 'interrogation' under *Miranda* refers *not only to express questioning*, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (emphasis added)). *Innis* made clear that "express questioning" and the "functional equivalent" of express questioning constitute distinct "prong[s]" of the interrogation inquiry. *Id.* at 302; *see also Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir.

36

2008) ("It is clear from the language, facts and context of *Innis*, that the Supreme Court defined interrogation as (1) express questioning; or (2) its functional equivalent."); *United States v. Brown*, 720 F.2d 1059, 1067 (9th Cir. 1983) ("[U]nder *Innis*, interrogation within *Miranda*'s requirements applies (1) to express questioning or (2) to the 'functional equivalent' thereof.").

Although *Innis* did not expand upon what constitutes "express questioning"—perhaps because that "prong" of the interrogation inquiry was not at issue in the case, 446 U.S. at 302—the Supreme Court did go into greater depth regarding the "functional equivalent" prong. That prong encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Importantly, that inquiry "focuses primarily upon the *perceptions of the suspect*, rather than the intent of the police." *Id.* (emphasis added).

Following *Innis*, lower courts—including this Court—have concluded that *Innis* likewise requires that courts assess whether a defendant was subject to "express questioning" *from the perspective of the suspect*, and not based on the subjective intent of the law enforcement officer engaged in the questioning. For instance, relying on *Innis*'s discussion of the "functional equivalent" prong, the District of Columbia Circuit held that the determination of whether an individual was subjected to express questioning "is an objective inquiry; the subjective intent of the officer is relevant *but not dispositive*." *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997) (emphasis added); *see also United States v. Johnson*, 734 F.3d 270, 276 (4th Cir. 2013) (examining whether "express

37

questioning" amounted to *Miranda* interrogation from the "suspect's point of view"); *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) ("A question is an interrogation if it is reasonably likely to elicit incriminating information." (internal quotation marks omitted)); *United States v. Allen*, 13 F.3d 105, 109 (4th Cir. 1993) (relying on *Innis*'s objective test to determine whether "express questioning" constituted interrogation for purposes of *Miranda*). Put differently, "the test for determining whether a suspect was subjected to interrogation is whether a reasonable objective observer would believe an officer's express questioning [was] reasonably likely to elicit an incriminating response." *United States v. Johnson*, 680 F.3d 966, 976 (7th Cir. 2012) (internal quotation marks and alterations omitted), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016). "The focus is on the *suspect's perceptions* rather than the intent of the police." *Id.* (emphasis added).

The extension of *Innis*'s objective, suspect-focused inquiry to the express questioning prong makes sense. *Innis* explained, for example, that the interrogation inquiry focuses on the "perceptions of the suspect, rather than the intent of the police" because "the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, *without regard to objective proof of the underlying intent of the police*." 446 U.S. at 301. That rationale is no less applicable to an express question than it is to the functional equivalent thereof.

That is particularly true in circuits, like this circuit, which recognize the possibility that a suspect can face "express questioning" without being subject to "interrogation" for purposes of *Miranda*, if the questions "are not reasonably likely to elicit incriminating

38

responses." *Johnson*, 734 F.3d at 276. *But see Smiley*, 542 F.3d at 583 (holding that because the defendant was subject to "express questioning," the lower court should not have considered whether question was reasonably likely to elicit an incriminating response). If, as this Court holds, a defendant can be exempted from *Miranda*'s protections on grounds that the express questions he faced were "not reasonably likely to elicit incriminating responses," *Johnson*, 734 F.3d at 276—*Innis*'s test for whether police action amounts to the functional equivalent of express questioning—then *Innis* requires that the express questioning assessment be made from the suspect's perspective.

Because whether a suspect was subject to express questioning must be examined from the perspective of the suspect, the district court committed legal error in denying Defendant's motion to suppress his un-*Mirandized* inculpatory statements.

The district court rested its decision *entirely* on "Agent Oliver's testimony that he did direct the question at Ms. Bell," not at Defendant. J.A. 392. But nowhere in the district court's oral ruling, or its earlier oral factual findings, did the district court consider the relevant question: whether a reasonable suspect in Defendant's position would have believed that Special Agent Oliver's question was directed at Defendant. Notably, the district court failed to address that dispositive question, even though Defendant's counsel repeatedly argued that the court should do so. *See, e.g.*, J.A. 337–38 (arguing that "[i]t really doesn't even matter as to what Agent Oliver's subjective intent was" because Defendant "took the question [as] being addressed to him reasonably and answered in response.").

That legal error is significant because the factual record includes evidence that could allow a factfinder to conclude that a reasonable suspect in Defendant's position would have believed that the question was directed at him. In particular, as my colleagues in the majority acknowledge, at the time of the questioning Defendant "was seated in 'another chair off to the right, behind [his wife's] chair,' and the two chairs were 'in close proximity' to each other." *Ante* at 9. Even though Special Agent Oliver *intended* to—and, according to his unrebutted testimony, did in fact—*direct* the question to Defendant's wife, a person seated directly "behind" and "in close proximity" to Defendant's wife, as Defendant was, may have reasonably believed that Special Agent Oliver was directing the question to him or to both he *and* his wife.

For the same reason, a factfinder could conclude that an officer in Special Agent Oliver's position "should have known" that directing a question at Defendant's wife, when Defendant was seated directly "behind" and "in close proximity" to her, was "reasonably likely to elicit an incriminating response" from Defendant. *Innis*, 446 U.S. at 302. That is particularly true given that Special Agent Oliver (1) testified that he did not preface either his initial statement about the search warrant or the question regarding weapons by stating Defendant's wife's name, nor did he instruct only her to answer, and (2) obtained a "no knock" warrant so as to place Defendant in a "state of confusion" at the time of the questioning. J.A. 61. Put differently, Special Agent Oliver's testimony in no way precludes a finding that a reasonable person in Defendant's position would have believed that the question was directed at him—the dispositive issue never addressed by the district court.

That Special Agent Oliver's question—whether "there [were] any weapons in the house"[2]—was "directly relevant to the substantive offense charged" provides further evidence that the question was "reasonably likely to elicit incriminating information,"

---

[2] At several points the majority opinion emphasizes that the question was "relating to officer safety." *Ante* at 9, 12. Whether Special Agent Oliver's *intent* in asking the question was to protect the safety of the officers searching the residence does not resolve whether the question amounted to interrogation for purposes of *Miranda*—an inquiry that "focuses primarily upon the perceptions of the suspect, *rather than the intent of the police*." *Innis*, 446 U.S. at 301 (emphasis added).

To be sure, *Miranda*'s "public safety exception" permits law enforcement officers to ask questions, without giving *Miranda*'s prophylactic warnings, if doing so is necessary to protect the officers or the public from immediate danger. *See United States v. Mobley*, 40 F.3d 688, 692 (4th Cir. 1994). This Court has held that the public safety exception "must be construed narrowly" and "applies *only* where there is 'an objectively reasonable need to protect the police or the public from an *immediate danger* associated with [a] weapon.'" *Id.* at 693 (emphasis added) (quoting *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984)).

Tellingly, the majority opinion does not uphold the district court's separate conclusion that Defendant's statements were admissible under the public safety exception. J.A. 393. For good reason; this case is on all fours with *Mobley*, in which this Court declined to apply the public safety exception. There, law enforcement officers executed a search warrant at the defendant's apartment. *Mobley*, 40 F.3d at 690. After the officers had completed a "security sweep" of the apartment and placed the defendant under arrest, the officers asked the defendant "if there was anything in the apartment and specifically any weapons that were in the apartment that could be of danger to the agents" who were conducting the search. *Id.* at 690–91. This Court concluded that, under these facts, the government failed to demonstrate "an 'immediate need' that would validate" application of the public safety exception. *Id.* at 693.

Like in *Mobley*, when Special Agent Oliver asked the question regarding weapons, the Emergency Services Team had finished performing their protective sweep and Defendant and his wife were handcuffed and under the control of the officers. Accordingly, without endangering themselves or others, the law enforcement officers could have advised Defendant of his *Miranda* rights before asking if there were any dangerous objects in the homes. Therefore, there was no "immediate need" warranting application of the public safety exception.

41

and therefore constituted interrogation for purposes of *Miranda*. *Cowan*, 674 F.3d at 958 (internal quotation marks omitted); *see also, e.g.*, *United States v. Williams*, 227 Fed. App'x 307, 311 (4th Cir. 2007) (holding that question amounted to "interrogation" for purposes of *Miranda* when law enforcement officer "should have known that any response to his questions would likely implicate [the defendant] in the" offense under investigation).

Here, Special Agent Oliver was investigating Defendant for drug and firearms offenses and expressly sought and obtained a warrant to seize any firearms found in his search of the residence. Accordingly, contrary to the majority opinion's conclusion, Special Agent Oliver's question was "directly relevant to the substantive offense charged," *Cowan*, 674 F.3d at 958, and therefore reasonably "likely to elicit from [Defendant] a statement implicating himself in the illegal possession of a firearm," *ante* at 12.

Significantly, even if it were appropriate for this Court to independently review the record to determine whether a reasonable person in Defendant's position would have believed the question was directed at him, we cannot do so because the record on appeal omits a crucial piece of evidence bearing on that question. During cross-examination, defense counsel presented Special Agent Oliver with a diagram of the room in which the questioning occurred. At defense counsel's request, Special Agent Oliver made "X" marks on the diagram to indicate in which chairs Defendant and his wife were seated and where those chairs were located in the room. That marked diagram is not part of the record on appeal, nor was it preserved by the district court.

42

Additionally, during oral argument on the suppression motion—which occurred more than a week after Special Agent Oliver's testimony—the district court expressed confusion regarding where, exactly, Defendant and his wife were seated relative to each other. J.A. 359 ("I looked back in my notes and, even then, I wasn't hundred percent sure [i]n terms of who is seated where at the time the question is being asked."). The record includes no indication that the district court ever resolved that uncertainty, which bears directly on whether Defendant reasonably believed, based on his proximity relative to his wife, that the question was directed at him. In such circumstances, this Court should, at a minimum, remand the case to the district court to determine whether, under the proper legal standard, Defendant's inculpatory statements should have been suppressed.[3]

## II.

---

[3] After concluding that Special Agent Oliver did not expressly question Defendant, the majority opinion further concludes that Defendant was not subjected to the "functional equivalent" of express questioning. *Ante* at 12–13. In particular, the majority opinion states "[i]t can hardly be said that overhearing a single question posed to one's spouse creates the necessary level of compulsion without more" to amount to the functional equivalent of express questioning. *Id.* at 13. The majority opinion offers no legal authority in support of this assertion, nor does the majority opinion examine the coerciveness of the questioning from *Defendant's perspective*, as *Innis* requires. 446 U.S. at 301. And one can easily imagine situations in which law enforcement officers directing questions at a suspect's spouse or other family member would be "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

Additionally, the majority opinion errantly treats the district court's assertion that Defendant "'volunteered' his answer" as relevant to the *Miranda* inquiry, notwithstanding that the Supreme Court has held that "*Miranda*'s procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake." *J.D.B. v. North Carolina*, 564 U.S. 261, 281 (2011).

I also disagree with my colleagues' conclusion that Defendant's two 1985 Maryland convictions for "robbery with a deadly weapon" qualified as predicate convictions supporting enhancement of Defendant's sentence Section 924(e) of the ACCA. "[W]e review de novo the question whether his prior state convictions qualified as predicate felony convictions for purposes of a federal sentence enhancement." *United States v. Gardner*, 823 F.3d 793, 801 (4th Cir. 2016) (internal quotation marks and alterations omitted).

The ACCA subjects a defendant to substantial mandatory minimum sentences if the defendant has three prior convictions for "violent felon[ies]." 18 U.S.C. § 924(e)(1) The ACCA's "force clause" provides, in pertinent part, that a crime is a "violent felony" if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i). Only "violent force—that is, force capable of causing physical pain or injury to another person"—satisfies the "physical force requirement." *Johnson v. United States*, 559 U.S. 133, 140 (2010). In determining whether a prior offense constitutes a violent felony for purposes of the force clause, we apply the "categorical approach," under which we "must determine whether the state crime of conviction *by its elements*"—*i.e.* not under the particular facts underlying a defendant's prior conviction—necessarily "involves the 'the use, attempted use, or threatened use of physical force against the person of another.'" *United States v. Reid*, 861 F.3d 523, 527 (4th Cir. 2017). We look to state law to make that determination. *Gardner*, 823 F.3d at 803. In engaging in that analysis, we first look to decisions of the State's highest court, with decisions of a State's intermediate appellate court

44

"constitut[ing] the next best indicia of what state law is." *Id.* (quoting *Castillo v. Holder*, 776 F.3d 262, 268 & n.3 (4th Cir. 2015)).

Defendant argues that his two 1985 Maryland convictions for armed robbery do not constitute "violent felonies" because, under Maryland law, a defendant can commit armed robbery through use or threatened use of violent force solely against *property*, and therefore that the offense does not categorically require use of force "against the *person* of another," as Section 924(e)(2)(B)(i) requires. In an analogous context, this Court held that when an offense can be committed through use or threatened use of violence against *property* alone, then the offense does not fall within language identical to that of the force clause. *Parral-Dominguez*, 794 F.3d at 445.

Under Maryland common law, to convict a defendant of armed robbery, the State must prove that the defendant (1) committed simple "robbery" while (2) using a "dangerous or deadly weapon." *Williams v. State*, 490 A.2d 1277, 1280 (Md. 1985). Simple robbery is "the felonious taking and carrying away of the personal property of another from his person by the use of violence *or* by putting in fear." *Id.* (emphasis added). In two opinions, an intermediate Maryland appellate court held that the "fear" element of simple robbery may be satisfied by "fear . . . of injury to the person *or to property*, as for example, a threat to burn down a house." *Giles*, 261 A.2d at 807–08 (emphasis added); *Douglas v. State*, 267 A.2d 291, 295 (Md. App. 1970) ("That the fear be of great bodily harm is not a requisite. *Nor need the fear be of bodily injury at all.*" (emphasis added)). Neither of those holdings has been overturned. In a separate case, the Government conceded that, under *Giles* and *Douglas*, simple robbery—a constituent

45

element of armed robbery—did not constitute a crime of violence because it encompassed "threats against property," not simply "against the person of another," as the force clause requires. *United States v. Baten*, No. 04-CR-0256, Docket No. 23 (D. Md. Nov. 16, 2015).

Notwithstanding its prior concession as to simple robbery, the Government now argues—and the majority opinion agrees, *ante* at 28—that *Giles*'s and *Douglas*'s statements that robbery can be accomplished by threats to property are not dispositive because neither case involved a threat to property, rendering the statements dicta. But neither the Government nor the majority opinion identifies any controlling authority holding that we should disregard dicta in ascertaining whether a state law constitutes a crime of violence.

To the contrary, this Court and other Circuits previously have relied on dicta in state court opinions in determining whether a state offense crime was a "violent felony" for purposes of the ACCA. For example, in *United States v. Aparicio-Soria*, 740 F.3d 152 (4th Cir. 2014) (en banc), this Court expressly relied on dicta in determining whether a state offense categorically constituted a "crime of violence" for purposes of the sentencing guidelines, *id.* at 157-58 & n.4; *see also id.* at 164 (Wilkinson, J., dissenting) (noting that language in state opinion relied on by majority was dicta). Other circuits have taken the same approach. *See, e.g.*, *United States v. Vail-Bailon*, 868 F.3d 1293, 1304 (11th Cir. 2017) (relying on dicta in state court opinion in determining whether state offense was "crime of violence"); *id.* at 1322 (Rosenbaum, J. dissenting) (noting that state decision relied on by majority was dicta); *United States v. Smith*, 582 F. App'x 590,

46

596 & n.5 (6th Cir. 2014) (relying on dicta in state court opinion in determining whether North Carolina common law robbery was a crime of violence because courts should "defer to the North Carolina Supreme Court on the interpretation of North Carolina law"), *vacated on other grounds* 135 S. Ct. 2930 (2015).

Accordingly, that the language in *Giles* and *Douglas* was dicta in no way bars this Court from considering it in determining whether Maryland armed robbery constitutes a violent felony under the ACCA's force clause. Indeed, because *Giles* and *Douglas* remain good law, lower Maryland courts are bound to convict a defendant of robbery if the defendant solely threatens the victim's property, not his person. In such circumstances, it makes no sense to disregard *Giles*'s and *Douglas*'s description of the fear element as dicta.

Notwithstanding the *express* language in *Giles* and *Douglas,* my colleagues in the majority rely upon the supposed silence of two Maryland appellate decisions post-dating Defendant's convictions that describe the "fear" element of robbery *without* reference to threats to property. *Ante* at 28-29 (citing *Spencer v. State*, 30 A.3d 891, 898 (Md. 2011) and *Snowden v. State*, 583 A.2d 1056, 1059 (Md. 1991)). But *Spencer* and *Snowden* involved defendants who threatened or inflicted bodily harm, meaning that neither court needed to consider the standard for putting a victim in fear through harming or threatening to harm property. *Spencer*, 30 A.3d at 893; *Snowden*, 583 A.2d at 1057. And neither opinion addressed whether harm to property could satisfy the "fear" element, much less overruled *Giles*'s and *Douglas*'s earlier unambiguous statements that threats to property could satisfy that element. Additionally, both opinions post-date Defendant's

47

conviction, meaning that the could not have implicitly abrogated, much less overruled, *Giles* and *Douglas* at the time of Defendant's conviction.

The majority opinion also relies on a Maryland Court of Appeals decision that post-dates Defendant's convictions: *West v. State*, 583 A.2d 231 (Md. 1988). But, if anything, *West* supports Defendant's contention that a defendant can be convicted of armed robbery without using or threatening to use violent force against the person of another. In particular, *West* holds that a defendant can be convicted of robbery based on the application of "constructive" force "by intimidation or placing the victim in fear." *Id.* at 234. As *Giles* explains, a defendant can place a victim in fear by threatening the victim's property—e.g., "threat[ening] to burn down a house"—without ever applying physical force against the person of the victim, as the force clause demands. *Giles*, 261 A.2d at 807–08. That, in such a case, the victim is in fear that violent force will be applied against his *property* in no way establishes that his *person* was subject to "force capable of causing physical pain or injury," as the force clause requires. *See Johnson*, 559 U.S. at 140. Accordingly, contrary to the majority opinion's suggestion, *West* is entirely consistent with *Giles* and *Douglas*.

That Defendant committed armed, as opposed to simple, robbery also does not change this conclusion. The majority opinion implies that this Court should not treat Maryland armed robbery as a violent felony because there is not a "realistic probability"—but rather only a "theoretical possibility"—that a suspect can commit armed robbery by harming or threatening to harm property. *See ante* at 29 (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013)).

48

Even assuming it is possible to draw an enforceable line between a "realistic probability" and "theoretical possibility"—which the majority opinion makes no effort to do—it takes little "legal imagination" to conceive of how a defendant could use a weapon to inflict or threaten harm to a victim's property without threatening the victim's person. *Moncrieffe*, 569 U.S. at 191. Maryland courts already have *expressly provided an example*: "threat[ening] to burn down a house." *Giles*, 261 A.2d at 807–08. And there are numerous cases in which other courts have recognized that a suspect can commit robbery or armed robbery, under legal frameworks materially indistinguishable from Maryland common law armed robbery, by threatening a victim's *property* as opposed to his person. *See, e.g.*, *United States v. O'Connor*, 874 F.3d 1147, 1154 (10th Cir. 2017) (holding that Hobbs Act robbery constitutes violent felony because for example, a suspect could commit a Hobbs Act robbery by saying to a victim, "If you don't give me $1 million, I won't hurt you, but I'll blow up an empty building you own"); *U.S. v Becerrill-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008) (holding that defendant could be convicted of violating California robbery statute by making "mere threats to property, such as 'Give me $10 or I'll key your car' or 'Open the cash register or I'll tag your windows'"); *People v. Gallegos*, 563 P.2d 937, 938 (Colo. 1977) (en banc) (holding defendant committed attempted "robbery by threat" when defendant "threat[ened] to blow up a Greeley business unless its owner paid him $100").

Importantly, none of the three opinions of our sister circuits concluding that Maryland robbery constitutes a violent felony under the force clause or statutory language similar thereto are binding on this Court. *See ante* at 29–30 (citing *United*

49

*States v. Redrick*, 841 F.3d 478, 485 (D.C. Cir. 2016); *United States v. Warren*, 723 Fed. App'x 155, 165 (3d Cir. 2018) (unpublished); *United States v. Segovia*, 770 F.3d 351, 355 (5th Cir. 2014)).  Indeed, none of the three opinions is persuasive.

*Redrick* principally ignored the harm-to-property language in *Giles* and *Douglas* on grounds that that language was dicta.  841 F.3d at 485.  But, as explained above, in this Circuit, we have held, for good reason, that dicta should be considered in determining whether a prior offense constitutes a violent felony.  *See Aparicio-Soria*, 740 F.3d at 157-58 & n.4.  *Redrick* also relies on an intermediate Maryland appellate court decision—which post-dates both of Defendant's convictions—defining assault, which it characterizes as a constituent element of robbery, as the attempted or actual application of force "to the body of the victim."  841 F.3d at 485 (quoting *Lamb v. State*, 613 A.2d 402, 446 (Md. App. 1992)).  But unlike *Giles* and *Douglas*, which expressly dealt with robbery, robbery was not at issue in *Lamb*, meaning that *Lamb* could not have abrogated *Giles*'s and *Douglas*'s statement that the fear element for robbery encompasses harm or threats to property.  Given this material distinction, it is unsurprising that the majority opinion does not embrace this aspect of *Redrick*'s reasoning.

*Warren* disregarded the harm-to-property language in *Giles* and *Douglas* on grounds that those decisions were issued by an "intermediate-appellate court" and therefore were "not binding."  723 Fed. App'x at 164.  But we have held in this Circuit that when, as here, there is an absence of authority from a state's highest court, this Court follows the decisions of intermediate state appellate courts unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise."

50

*Castillo*, 776 F.3d at 268 n.3 (internal quotation marks omitted). And neither the Government nor the majority opinion points to language in any opinion by the Maryland Court of Appeals indicating that *Giles*'s and *Douglas*'s characterization of the fear element as encompassing threats to property no longer remains good law. Perhaps for this reason, the majority opinion declines to rely on *any* aspect of *Warren*'s reasoning.

Finally, *Segovia* never mentions *Giles* or *Douglas*, much less examines whether harm or threats to property satisfy the fear element, and therefore is even less persuasive. 770 F.3d at 355.

## III.

In sum, the majority opinion follows the district court's legal error by analyzing Defendant's *Miranda* argument from the perspective of the law enforcement officer, not the suspect. And the majority opinion incorrectly holds that Maryland armed robbery categorically constitutes a violent felony for purposes of the ACCA.

Accordingly, I respectfully dissent.